UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JESSICA L. FAGRE, as the Personal Representative of the Estate of AMBROSHIA E. FAGRE,<br><br>       Plaintiff<br><br>v.<br><br>SCOTT W. IRELAND, et al.<br><br>       Defendant | No. 1:19-cv-00083-LEW |

### DECISION AND ORDER ON DEFENDANTS' <u>MOTIONS TO DISMISS</u>

Plaintiff Jessica Fagre brings this action on behalf of her deceased daughter, Ambroshia E. Fagre ("Amber"), against Defendants Mark Brown, the Chief of Police of the Vassalboro Police Department, and Maine State Police Lieutenant Scott W. Ireland and Trooper Jeffrey Parks alleging claims arising from the fatal shooting of Amber Fagre. Compl. (ECF No. 2-1).  The matter is before me on Defendants' motions to dismiss all counts against them pursuant to Fed. R. Civ. P. 12(b)(6).  Mot. Dismiss (ECF No. 4); Mot. Dismiss (ECF No. 6).

### FACTS

I accept as true the Plaintiff's well-pleaded allegations and will draw all reasonable inferences in the Plaintiff's favor.  Fed. R. Civ. P. 12(b)(6); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012); *Sanchez v. Pereira–Castillo*, 590 F.3d

31, 41 (1st Cir. 2009). I will reject "unsupported conclusions or interpretations of law." *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993).

On February 10, 2017, Lieutenant Ireland (while presumably off duty) was notified by his neighbor that a suspicious Dodge Durango was parked on the neighbor's property in Vassalboro, Maine. Compl. ¶ 9. In response to his neighbor's concern, Lieutenant Ireland put on his Maine State Police jacket and gun belt and drove to his neighbor's home. *Id.* ¶¶ 10-11. Upon arrival, Lieutenant Ireland observed a Dodge Durango parked in a turnaround on the road and a woman slumped over and seemingly unconscious inside the vehicle. *Id.* ¶¶ 12-14. Lieutenant Ireland approached the vehicle, pounded on the passenger window, and, once the woman was awake, asked her to get out of the car. *Id.* ¶¶ 15-17. The woman, Ambroshia ("Amber") Fagre, told Lieutenant Ireland that she was waiting for her boyfriend to return to the vehicle.[1] *Id.* ¶ 20. Ms. Fagre appeared to be "very lethargic" and "out of it" at the time of this interaction. *Id.* ¶ 19.

Lieutenant Ireland was then joined by Sargent Galen Estes – an officer with the Kennebec County Sheriff's Office – who informed Lieutenant Ireland that he was investigating a burglary in the area. *Id.* ¶ 22. Upon noticing footprints in the snow leading from the Durango to a nearby home, Lieutenant Ireland attempted to contact the homeowner. *Id.* ¶¶ 23-24. When he was unable to speak with the homeowner, Lieutenant Ireland contacted a relative of the homeowner who informed him that the homeowner had been tied up at gunpoint and his home ransacked. *Id.* ¶¶ 24-26. Lieutenant Ireland went

---

[1] Amber Fagre referred to her boyfriend using various names such as Nick, Brian, and Hunter, but informed Lieutenant Ireland that she does not know his last name. *Id.* ¶ 21.

to the home to investigate and requested that Sergeant Estes stay with Amber Fagre at the Durango. *Id.* ¶¶ 27-28.

At the home, Lieutenant Ireland learned that a man, who was later identified as Ms. Fagre's boyfriend, Kadhar Bailey, had held the homeowner at gunpoint and tied him up before ransacking the house and fleeing in the homeowner's pickup truck. *Id.* ¶¶ 32-33. Lieutenant Ireland then searched the area, located the homeowner's truck parked on a snowmobile trail, and noticed footprints leading from the truck toward the area where the Dodge Durango was parked.[2] *Id.* ¶¶ 34, 35.

Meanwhile, a third officer arrived at the scene: Chief Mark Brown.[3] *Id.* ¶ 29. Estes left the area and Brown remained with Ms. Fagre. *Id.* ¶ 31. Ireland radioed Brown and updated him regarding the home invasion and his belief that Bailey was heading toward the Dodge Durango and was armed. *Id.* ¶ 36. Brown, who was still with Amber Fagre near the Durango, then saw Bailey approaching with a handgun, drew his own firearm, and ordered Bailey to stop. *Id.* ¶¶ 40, 41. Despite Brown's commands, Bailey continued to approach Brown, Ms. Fagre, and the Durango and Brown took cover on the driver-side hood of the vehicle while Ms. Fagre remained seated in the passenger seat of the vehicle. *Id.* ¶¶ 42-44. Brown then fired his gun at Bailey and took cover behind a nearby snowbank. *Id.* ¶ 45. Bailey returned fire, got in the Dodge Durango, and began to drive the vehicle. *Id.* ¶¶ 47-49. Brown fired another shot at Bailey. *Id.* ¶ 50.

---

[2] The Complaint mistakenly stated Brown located the truck but this factual point was corrected in later filings. *See* Pl.'s Resp., 4 n. 1 (ECF No. 12, #86).

[3] Brown learned there were drugs inside the Durango and also that Ms. Fagre had two rings in her sweatshirt pocket that her boyfriend had asked her to hold. *Id.* ¶ 30. It is unclear from the complaint when these items were first discovered, but as alleged, it is clear Brown was aware of their presence. *Id.*

Trooper Parks arrived on the scene and upon hearing gunshots, stopped his police cruiser in the road and got out of his vehicle. *Id.* ¶¶ 51-52, 54. Lieutenant Ireland, who was returning to the scene on foot, also heard the gunshots. *Id.* ¶ 53. As Bailey continued to drive the Durango toward Parks's cruiser, Parks moved behind his cruiser and then sought cover behind a snowbank. *Id.* ¶¶ 55, 57. Plaintiff alleges that from behind the snowbank, Parks fired several rounds into the Durango. *Id.* ¶¶ 58, 61. The Durango then crashed into Parks's cruiser and finally came to a stop. *Id.* ¶¶ 65, 67. The Plaintiff alleges that prior to firing his gun, Parks had been notified by "dispatch, or one or more police officers" that Ms. Fagre was a passenger in the Durango. *Id.* ¶ 60.

Armed with a patrol rifle, Lieutenant Ireland approached the driver side of the Durango. *Id.* ¶ 68. When he observed Bailey reaching for something in the vehicle, Lieutenant Ireland fired a shot at Bailey, killing him. *Id.* ¶¶ 69, 70.

The officers then discovered that Amber Fagre had suffered a serious gunshot wound, which later was determined to have been a round fired from Parks's handgun. *Id.* ¶ 68. She remained conscious after being shot and was aware of her injury. *Id.* ¶ 72. Ms. Fagre was taken to the hospital and received care for her gunshot wound, but ultimately died because of her injury. *Id.* ¶ 73.

## DISCUSSION

Plaintiff asserts six counts arising from the Defendants' use of force and failure to affirmatively take action to prevent harm to Amber Fagre: (I) violation of Ms. Fagre's Fourth Amendment's guarantee to be free from the use of excessive and unreasonable force, under 42 U.S.C. § 1983; (II) violation of the prohibition on use of excessive force

under Article 1 § 5 of the State of Maine Constitution; (III) violation of Ms. Fagre's civil rights under the Fourteenth Amendment, under § 1983; (IV) negligence, based on Defendants' alleged violation of a "special duty of care to protect [Ms. Fagre] from harm"; (V) wrongful death pursuant to 18-A M.R.S.A. § 2-804, Maine's Wrongful Death Act; and (VI) a second claim for wrongful death under 18-A M.R.S.A. § 2-804 arising from the "period of conscious pain and suffering after [Ms. Fagre was] shot by Trooper Parks." Complaint (ECF No. 2-1).

All three defendants move for dismissal of the claims against them. In their motions, Defendants assert that Plaintiff has failed to allege facts sufficient to support a claim that they violated Amber Fagre's various constitutional or statutory rights and that even if Plaintiff had successfully stated a claim upon which relief could be granted, they are nevertheless entitled to immunity. Mot. Dismiss (ECF No. 4); Mot. Dismiss (ECF No. 6).

I will consider the claims against each defendant in turn, mindful that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is not a crucible in which to resolve the merits, but rather a means to test whether Plaintiff has alleged "sufficient facts to show that [s]he has a plausible entitlement to relief." *Sanchez*, 590 F.3d at 41. To avoid dismissal, Plaintiff's complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under the 12(b)(6) framework, I may grant a motion to dismiss "only if it clearly appears that [the Plaintiff] cannot recover on any viable legal theory." *Barrington Cove, LP v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 5 (1st Cir. 2001).

### A.   SECTION 1983 CLAIMS (COUNT I & III)

Counts I and III assert claims under 42 U.S.C. § 1983. Compl. ¶¶ 74-86, 90-95. "[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617, 621 (1st Cir. 2000). The parties do not dispute Defendants acted under color of law as police officers or "state actors," but rather focus on the constitutional questions.

In Count I, Plaintiff alleges Defendants violated Ms. Fagre's Fourth Amendment right to be free from the use of excessive and unreasonable force, including (as to Brown and Ireland) by assisting and encouraging the deadly force applied to Amber by Parks and failing to take steps to prevent the same. Compl. ¶¶ 80-81. In Count III, Plaintiff alleges a violation of substantive due process based on Defendants' alleged failure to protect Amber. *Id.* ¶ 91. The claims are subject to review under the qualified immunity doctrine, even in the context of a motion to dismiss. *Haley v. City of Bos.*, 657 F.3d 39, 47 (1st Cir. 2011) (affirming, in part, dismissal on qualified immunity grounds); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery."); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (emphasizing that qualified immunity is a "threshold" question).

Qualified immunity shields law enforcement officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." [4]  *Harlow*, 457 U.S. at 818; *see also Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."). This expansive principle protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The defensive shield of qualified immunity has two layers. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the context of a motion to dismiss, the first layer is merely an issue of whether the complaint allegations state a plausible constitutional claim. *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015). If so, or if the plausibility question is difficult to answer, the second layer will still shield the defendant unless the constitutional claim is premised on law that was "clearly established" on the date of the underlying incident.[5]  *Id.*  In effect, unless the law was clearly established at the time, it is not fair to infer or presume that the defendant would have understood that his actions or inactions would constitute a deprivation of a

---

[4] As stated by the Supreme Court: "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

[5] In the First Circuit, this second inquiry can be subdivided into two components:

> To begin, the plaintiff must point to "'controlling authority' or a 'consensus of cases of persuasive authority'" that broadcasts "a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." [*Alfano v. Lynch*, 847 F.3d 71, 76 (1st Cir. 2017)] (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Then, the court must evaluate "whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.*

*McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017), *cert. denied*, 138 S. Ct. 1311 (2018).

constitutional right. *Id.* (citing *City & Cnty. of San Francisco, Calif. v. Sheehan*, --- U.S. ---, 135 S. Ct. 1765, 1774 (2015) (noting the need for existing precedent that "placed the … constitutional question beyond debate")).

"Courts have discretion to decide whether, on the facts of a particular case, it is worthwhile to address first whether the facts alleged make out a violation of a constitutional right." *Maldonado v. Fontanes*, 568 F.3d 263, 270 (1st Cir. 2009); *see also*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (declining to conclude whether a defendant violated the plaintiff's Fourth Amendment rights because "even assuming a Fourth Amendment violation occurred," the facts of the case established the defendant "was at least entitled to qualified immunity.").

Because vicarious liability does not apply to claims brought under § 1983, a plaintiff must allege facts to state a claim against each state official, based on that official's "own individual actions." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Calvi v. Knox Cty.*, 470 F.3d 422, 429 (1st Cir. 2006) ("Absent evidence of participation, concerted action, or at least culpable knowledge, one officer cannot be held jointly liable under section 1983 for another officer's [unconstitutional conduct]."). Accordingly, I consider the § 1983 claims with respect to each officer, beginning with Chief Brown.

### 1. Defendant Brown

Defendant Brown correctly argues he is entitled to dismissal, on the ground of qualified immunity, of Plaintiff's claims that he exerted excessive force against Ms. Fagre and violated her due process rights. Mot. Dismiss (ECF No. 4). Simply stated, Brown did not subject Ms. Fagre to a seizure, do anything to compel or command her seizure, or have

personal responsibility for how Trooper Parks might act given the nature of the encounter described in the complaint. Additionally, Plaintiff's allegation that Brown had a constitutional duty to protect Ms. Fagre is not based on clearly established law. No reasonable officer standing in Brown's shoes could have predicted what would happen next (without the benefit of hindsight) or anticipated that a constitutional duty required him to take some affirmative act to remove Ms. Fagre from her predicament.

Plaintiff asserts that Brown shares liability for Ms. Fagre's death because he "assisted" Trooper Parks in the use of deadly force or "encouraged and supported" Parks' decision to use deadly force against Ms. Fagre. Plaintiff's view is that Brown, by discharging his firearm, is complicit in Ms. Fagre's death, even though he did not shoot Ms. Fagre. As alleged, Brown was faced with an armed felon who fired at him and was attempting to make an escape through vehicular flight. Brown's decision to direct a shot at the truck may not have been the decision every officer would have made, but no reasonable officer would regard the choice as outside the realm of legitimate debate. *See*, *e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."). Where precedent does not suggest the unlawfulness of the decision to fire, Brown is shielded by the doctrine of qualified immunity even if I accept the premise that his non-lethal use of deadly force could be construed as a seizure. *Cf. Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 794, 795 (1st Cir. 1990) (concluding that "[a] police officer's

deliberate decision to shoot at a car containing a robber and a hostage *for the purpose of stopping the robber's flight* does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern." (emphasis in original)). Plaintiff has not cited any authority to the contrary involving closely analogous facts. *See Kisela*, 138 S. Ct. at 1152–53 ("Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." (quoting *Mullenix v. Luna*, --- U.S. ---, 136 S. Ct. 305, 309, (2015))).

Plaintiff also argues that Defendant Brown is liable for the actions of Defendant Parks. "An officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault v. Mun. of Salem, Mass.*, 923 F.2d 203, 207 n.3 (1st Cir. 1990). However, an officer who "had no 'realistic opportunity' to prevent an attack" cannot be liable for failing to intercede. *Id.* Plaintiff's theory does not hold water. Brown did not have reason to intervene because Parks had not yet acted. As alleged by Plaintiff, Parks was a latecomer to the scene and was positioned "down the road" from Brown's location. Additionally, given the circumstances it is unreasonable to infer that Brown could have instructed or advised Parks how to react. Parks faced a rapidly-unfolding, dangerous situation that required him to direct his faculties to the matter at hand. It would be naïve to infer that Brown had some special vantage point from which to instruct Parks how to carry out his duties. For instance, although we may be able to say with the benefit of hindsight that Mr. Bailey would not fire his gun again, how was Brown to know

that, and how was Brown supposed to assess the relative danger unfolding for Parks, who was at that time staring down an oncoming vehicle?  This theory of relief is neither plausible, much less based on clearly established law.

In Count III, Plaintiff alleges Brown violated Amber Fagre's due process rights because his "failure to protect [Ms. Fagre from Bailey] created and elevated the threat of harm to [Ms. Fagre] and 'shocks the conscience' in violation of the 14th Amendment." Compl. ¶ 93; Pl.'s Response, 28 (ECF No. 12, #110).  Plaintiff's allegations boil down to three actions (or omissions) which she claims gave rise to a constitutional violation: (1) Brown "fail[ed] to remove [Ms. Fagre] from the Durango and plac[e] her in a position of safety" once he learned Bailey was likely returning to the car and despite having observed Ms. Fagre's lethargic condition; (2) Brown "le[ft] Amber alone inside the Durango knowing an armed and dangerous suspect was approaching the Durango"; and (3) Brown "fir[ed] shots into the Durango knowing Amber was a passenger inside the vehicle." Compl. ¶ 91.

As the Supreme Court has held: "The contours of the right must be sufficiently clear that a *reasonable official* would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (emphasis added).  "In the end, the qualified immunity defense should prevail unless the unlawfulness of the challenged conduct was 'apparent' when undertaken." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004) (citing *Anderson*, 483 U.S. at 640).  Plaintiff has not identified any persuasive precedent suggesting that any of her three due process theories was clearly established on the day in question, and I am not aware of any such authority.  As far as protection against

11

Mr. Bailey is concerned, "a State's failure to protect an individual against *private violence* simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989) (emphasis added). There exists an exception to this rule called the "state-created danger" theory.[6] *See, e.g., Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in *a position of danger from private persons* and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." (emphasis added)); *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006) (instructing that a "constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source than he or she would have been in the absence of state intervention'" (citation omitted)). However, Brown did not create the danger for Amber Fagre. Mr. Bailey did when he failed to submit to arrest. Moreover, this theory raises a high bar for plaintiffs because "[a] proximate causal link between a government agent's actions and a personal injury does not, in itself, bring a case out of the realm of tort law and into the domain of constitutional due process." *Frances-Colon v. Ramirez*, 107 F.3d 62, 64 (1st Cir. 1997). To sustain her burden, the plaintiff must allege facts to establish that the state's actions were "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). The decision to leave Amber Fagre

---

[6] This theory of liability finds its origins in *DeShaney*, in which the Supreme Court "suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise." *Rivera v. Rhode Island*, 402 F.3d 27, 34–35 (1st Cir. 2005).

12

in the pickup truck, where the officers found her, neither created the danger nor rose to the level of conscience-shocking behavior.

Indeed, Plaintiff's state-created danger theory is not even plausible on the facts alleged. As established in the complaint, Brown did not take Amber Fagre into custody and effectively left her undisturbed and in no worse a position with relation to Bailey than she was when he first arrived. Ms. Fagre was a private citizen who had "no affirmative right to governmental aid." *DeShaney*, 489 U.S. at 196. In any event, even if the allegations could somehow be regarded as supporting a plausible claim, because the First Circuit "has discussed the possible existence of the state-created danger theory," but has "never found it applicable to any specific set of facts," Plaintiff can hardly claim Brown violated clearly established law. Brown is entitled to qualified immunity. *Irish*, 849 F.3d at 526; *see also J.R. v. Gloria*, 593 F.3d 73, 80 n.4 (1st Cir. 2010) (commenting that the First Circuit "has never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights").

### 2. Defendant Ireland

Given the facts alleged, and in light of the preceding discussion, it is not apparent how Defendant Ireland could be found liable for subjecting Amber Fagre to the deprivation of a constitutional right.

### 3. Defendant Parks

As asserted in Plaintiff's complaint, the bullet that fatally wounded Ms. Fagre was fired by Defendant Parks. Because Parks shot and killed Amber Fagre, dismissal of the

claims against Parks would require, at the bare minimum, additional information. *Landol-Rivera*, 906 F.2d at 792. Like the First Circuit in *Irish v. Maine*, I "have [some] questions to which [I] would prefer to have answers" and am hesitant to "make law in the absence of more facts." 849 F.3d 521, 523 (1st Cir. 2017).

### B. STATE CONSTITUTION (COUNT II)

In Count II, Plaintiff alleges the actions underpinning Counts I and III likewise violated the prohibition on the use of excessive force under Article 1 § 5 of the State of Maine Constitution, pursuant to 5 M.R.S. § 4682. However, "because the protections provided by the Maine Civil Rights Act, including immunities, are coextensive with those afforded by 42 U.S.C. § 1983, the dismissal of all of the [plaintiff's] § 1983 claims mandates that [the state law] claim receive similar treatment." *Estate of Bennett v. Wainwright*, 548 F.3d 155, 178–79 (1st Cir. 2008); *see also Whitten v. Moore*, No. 2:06-cv-164-GZS, 2007 WL 2609376, at *3 (Sept. 5, 2007), *aff'd*, , 2007 WL 3037247 (D. Me. Oct. 16, 2007) ("[F]ederal constitutional counts, which are brought under 42 U.S.C. § 1983, and . . . state constitutional counts, which are brought under 5 M.R.S.A. § 4682, are analyzed under the same legal standard."). Plaintiff has failed to allege facts to state a claim under 42 U.S.C. § 1983 that overcomes the qualified immunity defense raised by Brown and Ireland. Therefore, she has likewise failed to state a claim against either

defendant under the Maine Constitution.  Count II will be dismissed as to Brown and Ireland, but not as to Parks.

### C.   STATE LAW CLAIMS (COUNTS IV, V, VI)

In Count Four, Plaintiff asserts Defendants, acting in their roles as police officers, "owed [Ms. Fagre] a special duty of care to protect her from harm," but that they "acted unreasonably" and negligently when they "deployed deadly force" against Ms. Fagre by firing into the Durango when they "knew or reasonably should have known she was a passenger" in the vehicle and also when they "fail[ed] to remove [Ms. Fagre] from the Durango and place her in a position of safety."  Compl. ¶¶ 98-102.  In Counts Five and Six, Plaintiff asserts a wrongful death claim as well as a "conscious suffering" claim against Defendants under 18-A M.R.S. § 2-804, Maine's Wrongful Death Act.  Compl. ¶¶ 107, 110.  Once again, Defendants assert Plaintiff's allegations fail to state a claim against them and, in any event, that they are entitled to immunity under the Maine Tort Claims Act.  Mot. Dismiss, 20 (ECF No. 4, #50); Mot. Dismiss, 18 (ECF No. 6, #71).

State actors such as Defendants Brown, Ireland, and Parks are "absolutely immune from personal civil liability for . . . [p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused" so long as their actions are "reasonably encompassed" within their duties as a police officer.  14 M.R.S. § 8111(1)(C); *see also Norton v. Hall*, 2003 ME 118, ¶ 9, 834 A.2d 928 ("Actions taken by a law enforcement officer in response to an emergency implicate the discretionary judgment of the officer and the immunity protecting governmental entities and their employees extends to those actions."); *Miller v. Szelenyi,* 546 A.2d 1013, 1021 (Me. 1988) ("Discretionary

function immunity requires that the contested actions must be essential to the realization or accomplishment of a basic governmental policy, program or objective."). Because an officer's use of force is considered to be a discretionary act, *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996), it follows that an officer will be immune from liability unless they "clearly exceeded, as a matter of law, the *scope* of any discretion [they] could have possessed in [their] official capacity" by, for example, employing constitutionally objectionable force. *Polley v. Atwell,* 581 A.2d 410, 414 (Me.1990) (emphasis in original); *see also Richards v. Town of Eliot*, 2001 ME 132, ¶ 32, 780 A.2d 281, 292 ("If the officer uses excessive force in executing an arrest, such action is beyond the scope of the officer's discretion."). Applying the same standard, an officer's *failure* to perform a discretionary function – such as failing to remove Ms. Fagre from the Durango – will only cause the officer to forfeit immunity under state law if that failure was "so egregious as to clearly exceed any discretion the officers could have possessed under the circumstances." *Dimmitt v. Ockenfels*, 220 F.R.D. 116, 125 (D. Me. 2004), *aff'd*, 407 F.3d 21 (1st Cir. 2005); *see also Erskine v. Comm'r of Corr.*, 682 A.2d 681, 686 (Me. 1996) ("[Discretionary] immunity insulates from personal liability a government employee who has been legislatively authorized to perform some discretionary function and has acted, or has failed to act, pursuant to that authorization." (quotation marks and citations omitted)).

I am satisfied that Brown and Ireland's actions and omissions were discretionary in nature and, as previously discussed, that Plaintiff has failed to allege facts to establish they clearly exceeded constitutional bounds (or, in other words, the scope of their discretion as officers). *See Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 183 (D. Me. 2009) ("The

Law Court has clarified that the standard for deciding whether an officer accused of use of excessive force is entitled to MTCA immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim."). For these reasons, Brown and Ireland are entitled to immunity and dismissal as concerns Counts IV, V, and VI. However, as it is unclear whether Parks's use of force was constitutionally objectionable under the facts alleged, he is not entitled to dismissal.

## CONCLUSION

For the foregoing reasons, I **GRANT** Defendant Brown's motion to dismiss (ECF No. 4). As to Defendant Parks's and Defendant Ireland's motion to dismiss (ECF No. 6), I **GRANT** dismissal of all claims against Defendant Ireland, but **DENY** dismissal of all claims as they relate to Defendant Parks.

**SO ORDERED.**

Dated this 7th day of May, 2019.

/S/ Lance E. Walker
**LANCE E. WALKER**
**UNITED STATES DISTRICT JUDGE**