**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| |
|---|
| JESSICA L. FAGRE, as the Personal Representative of the Estate of AMBROSHIA E. FAGRE, <br><br> Plaintiff, <br><br> v. <br><br> SCOTT W. IRELAND et al. <br><br> Defendants. |

Docket No.: 1:19-cv-00083-LEW

**DEFENDANT JEFFREY PARKS'S MOTION**
**FOR SUMMARY JUDGMENT**

Defendant Jeffrey Parks moves under Fed. R. Civ. P. 56 for summary judgment on all claims against him in the complaint.

**Memorandum of Law**

The plaintiff estate in this case is pursuing a legal theory that the First Circuit has squarely rejected.  Specifically, Plaintiff is claiming that Defendant Parks, a Maine State Police trooper, violated its decedent's Fourth Amendment rights by accidently shooting her while firing his gun at someone else—the armed and dangerous driver of a vehicle in which the decedent was a passenger.  *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990) holds, on very similar facts, that only the intended target of a police officer's bullet can claim a Fourth Amendment violation.  As the undisputed facts here make clear, Trooper Parks did not intend to shoot Ms. Fagre, nor did he even know she was in the vehicle.  Under the controlling authority of *Landol-Rivera*, Trooper Parks did not violate Ms. Fagre's constitutional rights and is therefore entitled to qualified immunity.

Moreover, even if the Court could somehow find that Ms. Fagre was seized, that seizure was reasonable. Trooper Parks used deadly force against the driver only after the driver shot at another officer and then sped directly towards Parks, who was taking cover behind his marked police cruiser. Trooper Parks had barely enough time to get out of the way before the driver rammed his cruiser, pushing it 50 feet backwards and into a snowbank. Trooper Parks fired all of his 6 to 7 shots in rapid succession while he was still in immediate danger, just before or during the collision.

Given the extreme danger facing Trooper Parks (as well as other officers and the public at large), deadly force directed at the driver would have been reasonable even if Trooper Parks had known Ms. Fagre was in the vehicle. That Trooper Parks in fact saw no one in the vehicle but the driver only further confirms the reasonableness of his decision to use force.

Because he did not seize Ms. Fagre and, even if he did, that seizure was reasonable, Trooper Parks is entitled to qualified immunity on Plaintiff's federal and state constitutional claims. Moreover, because his actions were reasonable, Trooper Parks is entitled to discretionary-function immunity on Plaintiff's negligence claim. The Court should thus grant summary judgment on all claims against Trooper Parks.

### Summary of Undisputed Facts

*Police Find a Suspicious Vehicle*

Shortly after 4 pm on February 10, 2017, Lt. Scott Ireland of the Maine State Police discovered a suspicious Dodge Durango SUV parked on a back road near his home in Vassalboro. Defendant's Statement of Undisputed Material Facts ("SMF") (Docket #40) ¶¶ 1–4. When Lt. Ireland approached the Durango, its engine was running and Ms. Fagre was slumped over in the passenger seat. *Id.* ¶ 4. Footprints in the snow led from the Durango toward the home of a nearby resident, Richard Browne. *Id.* ¶ 5.

2

Lt. Ireland woke up Ms. Fagre and questioned her.  *Id.* ¶ 6.  She appeared confused and was unable or unwilling to explain why she was there or where the Durango's driver had gone. *Id.*  Lt. Ireland became suspicious that Ms. Fagre and her companion was breaking into nearby homes.  *Id.* ¶ 7.  He reported those suspicions over his police radio.  *Id.* ¶ 8.

*The Scene*

The Durango was backed into a turnout on the south side of Arnold Road.  *Id.* ¶¶ 4, 15. Arnold Road is a narrow dirt road that travels east from a main north-south road, Webber Pond Road.  *Id.* ¶ 11; *see also id.* Ex. A (map).  After less than half a mile, Arnold Road turns south for a short distance until it dead-ends.  *Id.*  Although there is only one residence on the east-west portion of Arnold Road, there are approximately a dozen residences on the final north-south leg of the road, which runs along the shore of Webber Pond.  *Id.* ¶ 13.  Another road, Fairway Drive, runs parallel to Arnold Road a short distance through the woods to the north.  *Id.* ¶ 14.  The homes on the south side of Fairway Drive are visible from Arnold Road through the woods.  *Id.*

The turnout in which the Durango was parked was on the south side of Arnold Road at the top of a small rise shortly before the road turns south.  *Id.* ¶ 15.  An unplowed driveway ran from the back of the turnout to a residence.  *Id.*  The rear of Richard Browne's home on Fairway Drive was visible a short distance through the woods to the northwest.  *Id.*  On the afternoon of February 10, 2017, there were snowbanks on either side of Arnold Road and packed snow on the road's surface.  *Id.* ¶ 16.  The weather was clear and extremely cold.  *Id.* ¶ 17.

*The Armed Robbery*

After observing the footprints leading toward Richard Browne's house, Lt. Ireland made a series of phone calls to check on Browne's safety.  *Id.* ¶ 18.  He eventually learned from one of Mr. Browne's relatives that a man (later identified as Kadhar Bailey), had broken into Browne's house, held a gun to the back of the head, tied him up, kicked him down the basement stairs,

3

ransacked the home, and absconded in Browne's pickup truck. *Id.* ¶ 18 & 10.  Lt. Ireland reported his findings over the radio, noting that the suspect was armed with "at least a handgun" and requested that all available units respond to the scene. *Id.* ¶ 19.  At some point, Ms. Fagre admitted to Lt. Ireland that her companion was breaking into houses. *Id.* ¶ 9.

As Lt. Ireland was making calls, a second officer, Sgt. Galen Estes of the Kennebec Sheriff's Office, arrived at the scene. *Id.* ¶ 20.  Lt. Ireland then left the scene to check on Mr. Browne, leaving Sgt. Estes with Ms. Fagre. *Id.* ¶ 21.  Sgt. Estes was soon joined by Vassalboro Police Chief Mark Brown. *Id.* ¶ 22.

Lt. Ireland met with Mr. Browne, who appeared shaken up. *Id.* ¶ 24.  Browne confirmed that a man had held him at gunpoint, tied him up, ransacked his home, and then escaped in Browne's pickup truck. *Id.*  Lt. Ireland reported this information over the radio. *Id.*

*Trooper Parks Responds to the Scene*

Defendant Jeffrey Parks, a sworn officer of Maine State Police since 2014, had been monitoring the radio as he returned home from his shift in his marked cruiser. *Id.* ¶ 26–28.  He heard Lt. Ireland's initial radio transmission about the suspicious vehicle. *Id.* ¶ 27.  When he heard Lt. Ireland's radio transmission that an armed male had taken a homeowner at gunpoint and stolen a vehicle and requesting all available units, he responded to the scene. *Id.* ¶¶ 29–30.

When Trooper Parks arrived at the scene, Sgt. Estes and Chief Brown were present. *Id.* ¶ 34.  The Durango was still parked in the turnout, and two other vehicles were parked nearby on Arnold Road. *Id.* ¶ 32; *see also* Exh. B (image of scene).  As Trooper Parks spoke with Sgt. Estes, he noticed Chief Brown speaking with someone in the passenger seat of the Durango, whom he understood to be the female suspect Lt. Ireland mentioned on the radio. *Id.* ¶ 35.

After a few minutes, Trooper Parks left in his cruiser to meet with Lt. Ireland on Fairway Drive. *Id.* ¶ 37. Lt. Ireland directed Parks to perform safety checks on the other residences on Fairway Drive, which Trooper Parks began to do. *Id.* ¶¶ 38–39.

### Lt. Ireland Locates Bailey

After returning to the Durango, Lt. Ireland received a report that Mr. Browne's truck had been found abandoned nearby. *Id.* ¶ 40. He then received a call from a nearby resident, who told him that the suspect was outside her home. *Id.* ¶ 41. Lt. Ireland and Sgt. Estes drove in separate vehicles to that location. *Id.* ¶ 42. Chief Brown stayed with Ms. Fagre. *Id.* ¶ 43. The area around the Durango was now empty of other vehicles. *Id.* ¶ 44.

Lt. Ireland eventually spotted Bailey running through the woods back toward the Durango. *Id.* ¶ 45. He directed Sgt. Estes to radio a warning to Chief Brown. *Id.* ¶ 46. He then got into another officer's cruiser and directed the officer to drive back to the Durango. *Id.* ¶ 47.

### Chief Brown and the Suspect Exchange Gunfire

As Chief Brown was standing outside the Durango, he heard Sgt. Estes's urgent warning over the radio. *Id.* ¶ 48. Chief Brown then spotted Bailey running toward him on the unplowed driveway behind the Durango, holding what appeared to be gun. *Id.* ¶ 49. Chief Brown identified himself as a police officer and ordered Bailey to drop the gun. *Id.* ¶ 50. After Bailey ignored Chief Brown's commands and raised his gun-arm toward Brown, Brown fired one or two shots at him. *Id.* ¶ 51. Chief Brown took cover behind a snowbank on the driver's side of the Durango and heard Bailey fire at least one shot. *Id.* ¶ 52. Brown returned fire. *Id.*

Next, the Durango pulled out of the turnout and turned left on Arnold Road, toward Webber Pond Road. *Id.* ¶ 53. As it did so, Chief Brown, fearing that Bailey now had a clear shot at him and intended to shoot him from the Durango, fired at least two additional shots toward the driver's side door, aiming at the driver. *Id.* ¶ 54. One of Chief Brown's shots

5

penetrated the driver-side door and exited through the bottom rear of the passenger side-window,
passing through the space where Ms. Fagre likely would have been had she been sitting upright
in the passenger seat.  *Id.* ¶¶ 55–57.

### The Suspect Rams Trooper Parks's Cruiser

Upon learning that the suspect may have been located, Trooper Parks returned to Arnold
Road in his cruiser.  *Id.* ¶ 59.  Seventeen minutes had elapsed since he was last at the scene.  *Id.*
¶ 66.  As he approached the still-parked Durango, Trooper Parks heard multiple gunshots coming
from the Durango's direction.  *Id.* ¶ 60.  He also saw someone crouched behind a snowbank on
the driver's side of the Durango and some sort of movement on the passenger side of the
Durango.  *Id.* ¶ 61.  Trooper Parks inferred—correctly—that he was witnessing a gunfight
between the suspect and police.  *Id.* ¶¶ 52, 62.  He also saw that the two other vehicles were
gone.  *Id.* ¶ 63–64; *see also* Exh. C (image of scene).  He did not know where they had gone or
who had left in them.  *Id.* ¶ 63.

Trooper Parks immediately stopped his cruiser in the road, about 75 feet from the
Durango, and took cover behind it.  *Id.* ¶ 65.  He then saw the Durango pull out of the turnout
with its tires spinning, turn toward him, and rapidly accelerate.  *Id.* ¶ 67.  It appeared that the
driver had pushed the gas pedal to the floor.  *Id.* ¶ 68.  Based on the Durango's acceleration and
the lack of room between the cruiser and the snowbanks, it was clear to Trooper Parks that the
driver intended to ram his cruiser.  *Id.* ¶ 70.

As the Durango sped towards him, Trooper Parks fled his cover and climbed onto the
snowbank on the north edge of the road.  *Id.* ¶ 71.  From there, he could see into the Durango
through the windshield.  *Id.* ¶ 72.  He saw a figure in the driver's seat.  *Id.*  The passenger seat,
which he could also see, appeared to be empty.  *Id.*  Believing his life was in immediate danger,

Trooper Parks fired six to seven shots from his service handgun in rapid succession, aiming specifically at the driver. *Id.* ¶¶ 73, 81.

As Trooper Parks was firing, the Durango rammed the front of his cruiser and pushed it backwards down Arnold Road. *Id.* ¶ 74. From when he recognized that Bailey intended to ram his cruiser, Trooper Parks had had just enough time before the collision to get to the snowbank, take aim at the driver, and fire. *Id.* ¶ 75. Because Parks's line-of-fire through the Durango to the driver changed as the Durango approached, his later shots penetrated the passenger side of the Durango's windshield at a sharp angle. *Id.* ¶ 79. As the front portion of the Durango passed him, Parks lost sight of the driver and stopped firing. *Id.* ¶ 85. Unknown to Trooper Parks, one of his shots struck Ms. Fagre. *Id.* ¶¶ 96–97.

The Durango pushed Parks's cruiser approximately 50 feet before the cruiser was pushed into a snowbank. *Id.* ¶ 88. The vehicles passed within a couple of feet of Trooper Parks. *Id.* ¶ 82. Bailey continued to rev the Durango's engine even after the vehicles came to a halt. *Id.* ¶ 89. When Bailey disobeyed police commands, another officer fired a single shot at him, incapacitating him. *Id.* ¶ 92. Officers then found Ms. Fagre slumped across the Durango's center console, with her head under the driver's arm. *Id.* ¶ 94. Trooper Parks did not learn that Ms. Fagre was still in the Durango until this point. *Id.* ¶ 93.

A loaded .32 caliber handgun was found near the driver's seat. *Id.* ¶ 101. It was also discovered that the Durango had been shifted into reverse following the collision. *Id.* ¶ 90.

The autopsy of Ms. Fagre found that she had been struck by a single bullet. *Id.* ¶ 95. The bullet first entered and then exited Ms. Fagre's right shoulder, traveling toward her head. *Id.* ¶ 98. The bullet then entered her head near the base of her skull and exited near the top of her head. *Id.* ¶ 98. It is the opinion of the State's forensic investigator that the autopsy results and

location of the bullet defects in the Durango make it extremely unlikely Ms. Fagre was sitting

upright when she was struck, corroborating Trooper Parks's testimony that the passenger seat

appeared empty when he fired at Bailey.  *Id.* ¶¶ 99.

### Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue of material fact and

the moving party is entitled to judgment as a matter of law."  *Cortes-Rivera v. Dep't of Corr. &*

*Rehab. of Com. of Puerto Rico*, 626 F.3d 21, 26 (1st Cir. 2010).  A nonmovant "cannot rely on

speculation to avoid summary judgment."  *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 136 (1st

Cir. 2013).

### Argument

## I.  TROOPER PARKS IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT CLAIM

In Count 1, the plaintiff asserts a claim under 42 U.S.C. § 1983 against Trooper Parks,

alleging that he used excessive force against Ms. Fagre in violation of the Fourth Amendment.

Qualified immunity is a defense against § 1983 claims.  "The doctrine of qualified immunity

protects government officials 'from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)).  "[Q]ualified immunity protects 'all but the plainly incompetent or

those who knowingly violate the law.'"  *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st

Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The test for determining qualified immunity at the summary judgment stage has two

parts.  First, the court considers whether "the facts, taken most favorably to the party opposing

summary judgment, make out a constitutional violation."  *Ford v. Bender*, 768 F.3d 15, 23 (1st

Cir. 2014).  Second, the court considers "whether the violated right was clearly established at the time that the offending conduct occurred."  *Id*.  The Court has discretion as to which prong of the analysis to consider first.  *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018).

The "clearly established" prong itself has two parts.  First, "the plaintiff must identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm."  *Id.*  Second, "the plaintiff must show that an objectively reasonable officer would have known that his conduct violated the law." *Id.*  "Because many law enforcement encounters arise from confusing, high-stakes circumstances, this second inquiry provides some breathing room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct."  *Id.*

## A.      Trooper Parks Did Not Seize Ms. Fagre

In his motion to dismiss, Trooper Parks contended that the complaint did not plead facts establishing a "seizure" under the Fourth Amendment because it did not allege that Trooper Parks shot Ms. Fagre intentionally.  The Court denied Trooper Parks's motion on grounds that additional information was necessary to resolve the issue.  Order at 13–14 (Docket #15).  The summary judgment record now provides that additional information, confirming that Trooper Parks's shooting of Ms. Fagre was an unfortunate accident, and therefore not a seizure.

In order to prove a Fourth Amendment seizure, plaintiff must demonstrate "a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original).  There must be "an intentional acquisition of physical control" over the plaintiff.  *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990).  "[P]olice action that simply *causes* a particular result" is insufficient.  *Id.*  Thus, force directed at someone other than the plaintiff cannot "seize" that

plaintiff, even if the plaintiff is a "reasonably foreseeable victim[]" of that force. *Schutlz v. Braga*, 455 F.3d 470, 482 (4th Cir. 2006); *see Landol-Rivera*, 906 F.2d at 795.

The First Circuit has applied the Supreme Court's reasoning in *Brower* to hold that police do not "seize" the passenger of a vehicle by inadvertently shooting him while trying to stop the driver. In *Landol-Rivera*, 906 F.2d at 795, the defendant officers responded to a robbery in which the robber had taken a hostage. *Id.* at 791. The robber attempted to escape with the hostage by commandeering a passing car. *Id.* at 792. As the car started moving, three officers opened fire on the vehicle, missing the robber but hitting the hostage. *Id.* The hostage sued for excessive force. *Id.* at 792.

Applying *Brower*, the *Landol-Rivera* court considered whether the defendant officers' decision to shoot into the car was an "intentionally applied" means of terminating the hostage's freedom of movement, with the plaintiff arguing that it was sufficient for the police to "*deliberately*" fire their weapons into the vehicle knowing that a hostage was inside. *Landol-Rivera*, 906 F.2d at 794 (emphasis in original). But the First Circuit disagreed. It rejected the plaintiff's theory that the intentionality requirement can be met "by the deliberateness with which a given action is taken." *Id.* at 795. Instead, it concluded: "[a] police officer's deliberate decision to shoot at a car containing a robber and a hostage *for the purpose of stopping the robber's flight* does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern." *Id.* at 796 (emphasis in original). In short, because the plaintiff "was not the object of the police bullet that struck him," he was not seized. *Id.* at 795.

So too here. It is indisputable that Trooper Parks did not intentionally fire his gun at Ms. Fagre. Rather, Ms. Fagre was struck by an errant bullet intended for Bailey. SMF ¶¶ 73, 80. Ms. Fagre thus was not the "the object of the police bullet that struck [her]." *Landol-Rivera*, 906

F.2d at 796.  Under the controlling authority of *Landol-Rivera*, Trooper Parks did not seize Ms. Fagre and therefore could not have violated her Fourth Amendment rights.

Indeed, the lack of a seizure is, if anything, even more clear-cut here than it was in *Landol-Rivera*.  That case considered whether an officer can seize a passenger by firing into a vehicle "with knowledge that [the passenger] was there."  *Id.* at 794.  Here, in contrast, Trooper Parks was not just unaware that Ms. Fagre was in the Durango, he had affirmative visual evidence that Ms. Fagre was *not* in the Durango.  As the Durango sped toward him, Trooper Parks could see that the passenger seat—where Ms. Fagre had been sitting during Parks's previous visit to the scene—now appeared to be empty.  SMF ¶ 72.  He also saw that the police vehicles that were at the scene when he was last there, 17 minutes earlier, were now gone, suggesting that Ms. Fagre may have been moved.  SMF ¶¶ 63, 66.  Thus, even if an officer intending to seize a vehicle's driver also seizes anyone he knows to be inside the vehicle if he terminates their freedom of movement—a view specifically rejected by *Landol*—Trooper Parks *still* would not have seized Ms. Fagre here, as she appeared to be no longer in the vehicle when he fired at the driver.

Plaintiff will likely point out that a circuit split has developed since *Landol-Rivera* as to whether an officer can, at least in some circumstances, seize a passenger by inadvertently injuring her while trying to stop a fleeing driver.  *See Plumhoff v. Rickard*, 572 U.S. 765, 778 n.4 (2014) (citing cases on both sides of split, including *Landol-Rivera*, but declining to resolve the split).  But *Landol* has never been overruled and remains controlling authority in this Circuit.

Finally, this case cannot be analogized to *Brendlin v. California*, 551 U.S. 249 (2007), which held that a traffic stop seizes a vehicle's passengers as well as its driver.  Trooper Parks was not trying to stop a vehicle and all its occupants, he was defending himself from a deadly

threat posed specifically by Bailey, who could have shot him as well as run him over.  It is thus

indistinguishable from a situation in which a bystander is struck by an errant bullet during a

shootout.  *See Simpson v. City of Fork Smith*, 389 F. App'x 568, 571 (8th Cir. 2010) (no seizure

where there was "no evidence that [Plaintiff] was struck by anything other than an errant

bullet"); *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (recognizing that inadvertent

shooting of a person in a vehicle that police did not know to be occupied was not a seizure).[1]

### B.   If There Was a Seizure, It Was Reasonable

Assuming arguendo that the Court could find that Trooper Parks seized Ms. Fagre by

unknowingly shooting her, the undisputed facts make clear that the seizure was reasonable under

the totality of the circumstances, and therefore did not violate Ms. Fagre's rights.

To show that a seizure violates the Fourth Amendment, the plaintiff must show that the

"level of force was objectively unreasonable under the circumstances."  *Fernandez-Salicrup v.

Figueroa-Sancha*, 790 F.3d 312, 326 (1st Cir. 2015).  This reasonableness calculus considers the

officer's actions in light of the "totality of circumstances."  *Graham v. Connor*, 490 U.S. 386,

397 (1989).  In deadly force cases, the primary inquiry is whether "a suspect poses an immediate

threat to police officers or civilians."  *Conlogue*, 906 F.3d at 156.  Other relevant factors include

"the severity of the crime at issue" and whether the suspect is "actively resisting arrest or

attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.[2]

---

[1]   *See also Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) ("bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout"); *Schultz v. Braga*, 455 F.3d 470 (4th Cir. 2006) (no seizure of driver who was hit by a ricocheting bullet fired at passenger); *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990) ("an innocent bystander struck by a stray bullet from the officer's weapon would not have [a Fourth Amendment] claim").

[2]   Courts also consider whether it was feasible to warn the suspect prior to using deadly force and, if so, whether such warning was given.  *Conlogue*, 906 F.3d at 156.  Here, Bailey was given a warning by Chief Brown.  SMF ¶ 50.  A second warning by Trooper Parks was neither required nor feasible.  *See* SMF ¶¶ 76–77.

The reasonableness standard is "comparatively generous to the police in cases where potential danger, emergency conditions, or other exigent circumstances are present." *Berube v. Conley*, 506 F.3d 79, 83 (1st Cir. 2007) (quoting *Roy v. Inhabitants of City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994)).  The calculus must allow for the fact that police officers are often forced to "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Roy*, 42 F.3d at 695).  Plaintiff thus may not rely on the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  Nor can Plaintiff survive summary judgment by showing merely that the police could have better handled the situation. *Roy*, 42 F.3d at 695 ("[I]n close cases, a jury does not automatically get to second-guess these life and death decisions, even though the plaintiff has an expert and a plausible claim that the situation could better have been handled differently."). Plaintiff must show that the decision to use deadly force was "so deficient that no reasonable officer could have made the same choice." *Id*.

The undisputed facts establish beyond question that a reasonable officer could have used deadly force against Bailey under the totality of circumstances.  From a mere 25 yards away, Bailey drove an SUV at maximum acceleration directly at Trooper Parks.  SMF ¶¶ 65–70. Trooper Parks had just enough time to move out of the roadway, take aim at Bailey and fire before Bailey rammed the marked police cruiser behind which Parks had been taking cover. *Id.* ¶ 75.  Moreover, Bailey collided with the cruiser with such force as to push it backward down the road roughly 50 feet, missing Parks by only a couple of feet in the process. *Id.* ¶¶ 82, 87. Trooper Parks easily could have been struck and killed during this collision.

What is more, the immediate threat posed by Bailey was not limited to his use of the Durango as a deadly weapon. *See McGrath v. Tavares*, 757 F.3d 20, 28 (1st Cir. 2014)

(recognizing that a car can be a deadly weapon).  As Trooper Parks was aware, Bailey also had a gun.  SMF ¶¶ 29, 101.  Trooper Parks knew that Bailey had already used that gun to commit serious crimes, including the robbery of Mr. Browne.  *Id.* ¶ 29.  Trooper Parks had also just witnessed what he reasonably and correctly believed to be a gunfight between Bailey and police.  SMF ¶¶ 52, 62.  A reasonable officer in Trooper Parks's shoes could have feared that Bailey might shoot him either from inside the approaching Durango or in a confrontation following the collision.  In addition, there were more than a dozen homes nearby, both through the woods on Fairway Drive and along the shore of Webber Pond.  SMF ¶¶ 13–14.  At least some of these homes were occupied.  SMF ¶¶ 24, 41.  Trooper Parks could have reasonably feared that, if allowed to escape, the armed and dangerous Bailey would pose a threat to nearby residents.

That Trooper Parks had cut off Bailey's only vehicular escape route by parking his cruiser in Arnold Road does not alter the reasonableness calculus.  A reasonable officer could not have been confident that a sport utility vehicle was incapable of getting around the cruiser.  SMF ¶ 84.  Had he escaped, Bailey would have posed a grave threat to pursuing officers, other motorists, and the public at large.  And, even if Bailey had no chance of escape, that did not end the threat.  Rather, it merely shifted risk from the public at large to the officers on the scene.  By blocking in Bailey, Trooper Parks was left in close proximity to an armed, dangerous, and cornered suspect who had already twice demonstrated his willingness to use deadly force against police.  Indeed, the extreme risk to Trooper Parks was confirmed when another officer was forced to shoot Bailey shortly after the Durango came to a stop.  SMF ¶ 92.

Two controlling authorities with notably similar facts confirm that Trooper Parks's use of deadly force was reasonable.  First, in *Plumhoff v. Rickard*, 572 U.S. 765 (2014), the plaintiff estate's decedent, Rickard, led police on a high-speed chase that resulted in Rickard crashing into

14

a police cruiser.  *Id.* at 769.  Rickard then began maneuvering his vehicle to extricate himself from the crash and eventually returned to the road.  *Id.* at 769–70.  Police fired several shots into the vehicle as Rickard was maneuvering, and several more after he returned to the road.  *Id.* at 770.  Rickard eventually crashed into a building, and both he and his passenger died from a combination of gunshot wounds and crash injuries.  *Id.*

The Supreme Court held that the officers' use of deadly force was reasonable.  The Court noted that the high-speed pursuit established that Rickard posed a "grave public safety risk."  *Id.* at 776.  It found it irrelevant that Rickard's vehicle had come to a "near standstill" when police opened fire, as he was still maneuvering the vehicle in an effort to escape.  *Id.*  Based on these facts, the Court held that a reasonable officer could conclude that "Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road."  *Id.* at 777.  Finally, the Court concluded that it was not unreasonable for officers to fire a total of 15 shots at the vehicle, reasoning that "during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee."  *Id.* at 777.

The second controlling authority is *McGrath v. Tavares*, 757 F.3d 20 (1st Cir. 2014).  In that case, an officer used deadly force against a burglary suspect after the suspect, McGrath, led officers on a high-speed chase and then crashed into a stone wall.  *Id.* at 24. When the officers approached him on foot, McGrath, after crashing into one of the cruisers and a telephone pole, drove toward the officers, prompting one of the officers to fire at McGrath.  *Id.*  Noting that the officer's "choices were to shoot or risk being run over" and that the suspect would continue to pose a threat to the public if he escaped, the First Circuit concluded that deadly force was reasonable.  *Id.* at 28–29.

*Plumhoff* and *McGrath* both support the reasonableness of Trooper Parks's actions. While Bailey did not lead police on a high-speed chase, his armed robbery of Richard Browne, gunfight with Chief Brown, and intentional ramming of Trooper Parks's cruiser made clear that he posed, if anything, an even greater public safety risk than Rickard or McGrath. Moreover, as in *Plumhoff* and *McGrath*, the threat had not ended by the time Trooper Parks finished firing his shots. Trooper Parks fired his 6 to 7 shots at Bailey while the Durango was still in motion and before it had passed him. SMF ¶¶ 79, 85. Like the defendant in *McGrath*, Trooper Parks's options as the Durango sped toward him were "to shoot or risk being run over." 757 F.3d at 28. The only difference is that in Trooper Parks could also reasonably fear being shot.

Finally, in assessing the reasonableness of Trooper Parks's use of force, Ms. Fagre's presence in the vehicle should play no role in the analysis. The Court must analyze objective reasonableness "in light of the circumstances and the facts known to [the defendant officer] at the time." *McGrath*, 757 F.3d at 29 (quoting *Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006)). Here, it cannot be disputed that Trooper Parks saw an apparently empty passenger seat as the Durango approached. SMF ¶¶ 35, 72. It is similarly indisputable that the forensic evidence makes it extremely unlikely that Ms. Fagre was sitting upright—and thus visible to Trooper Parks—when she was struck. SMF ¶ 99. And, it is undisputed that by the time Trooper Parks returned to the Durango after having been away for 17 minutes, two of the police vehicles that were previously parked there were gone, suggesting that Ms. Fagre may have been transported elsewhere. SMF ¶¶ 63, 66. Based on these observations, a reasonable officer could have concluded that Ms. Fagre was not in the Durango as it sped towards him. Her presence in the Durango was not part of "facts and circumstances" known to Trooper Parks at the time, and therefore cannot be considered.

16

Indeed, even if there were a genuine factual dispute as to whether Trooper Parks knew that Ms. Fagre was still in the Durango—and there is not—that dispute would not be material to reasonableness.  As already shown, Trooper Parks faced an immediate and deadly threat from Bailey when he fired his weapon.  It is far from clear that the presence of bystanders could ever constitutionally bar an officer from defending himself or others from an immediate deadly threat.  But even assuming arguendo that some hypothetical scenario might exist in which the presence of a bystander makes otherwise reasonable self-defense unreasonable, this case is not that scenario.  As already shown, Trooper Parks used deadly force in a situation in which he was at immediate risk of being run over or shot by Bailey.  Under those exigent circumstances, Trooper Parks's use of force against Bailey would have been reasonable even if he had been aware that Ms. Fagre was still in the vehicle.

### C. Even if Trooper Parks Violated Ms. Fagre's Fourth Amendment Rights, those Rights Were Not Clearly Established

To defeat qualified immunity, Plaintiff must show not only that the defendant violated a constitutional right, but that the right in question was "clearly established" at the time of the violation.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  This is an "exacting standard" and a "heavy burden indeed" for the plaintiff.  *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) (quoting *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015)).  To be clearly established, the contours of the right must be "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff*, 572 U.S. at 779.  "In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'"  *Id.* (quoting *al-Kidd*, 563 U.S. at 741).  That precedent, moreover, must be in the form of either "controlling authority" or "a robust

'consensus of cases of persuasive authority.'" *al-Kidd*, 563 U.S. at 742 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

As discussed in Part I.A, the First Circuit's decision in *Landol-Rivera* recognizes unequivocally that only the intended target of a police officer's bullet can be seized under the Fourth Amendment.  The First Circuit has never overruled *Landol-Rivera.*  Moreover, following its decision in *Brendlin*, the Supreme Court has recognized that a circuit split remains as to whether using force against a driver can seize a passenger.  *Plumhoff*, 572 U.S. at 778 n.4.  Given this state of the law, Trooper Parks was not on notice that he could violate the Fourth Amendment rights of any other occupants of the Durango by firing at the driver.

Even if Plaintiff could point to clearly established law holding that Ms. Fagre was seized, she still could not point to clearly established law indicating that Trooper Parks's use of force was unreasonable.  Except in the rare "obvious" case—which this case is not—plaintiff must "identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment."  *City of Escondido v. Emmons*, 139 S.Ct. 500, 504 (2019) (per curiam) (quoting *D.C. v. Wesby*, 138 S. Ct. 577, 581 (2018)).  "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

Undersigned is aware of no controlling authority holding that it is unconstitutional for an officer to use deadly force against an armed and dangerous individual who had just committed multiple violent felonies and who was speeding toward the exposed officer in an apparently otherwise empty vehicle.  Indeed, as already discussed, the two most factually similar controlling

cases, *Plumhoff* and *McGrath*, indicate that Trooper Parks's decision to use deadly force was entirely reasonable.  At the very least, those decisions preclude any conclusion that Trooper Parks was on notice that his use of deadly force was unconstitutional.

## II.    Plaintiff Is Not Pursuing a Fourteenth Amendment Claim Against Parks

As noted in the pre-filing memorandum (Docket #33), Plaintiff has confirmed that she is not pursuing Count III (failure to provide police protection) against Trooper Parks and does not oppose entry of judgment for Parks on that claim.  Judgment should thus be entered.

## III.   Trooper Parks Is Entitled to Judgment on Plaintiff's State-Law Claims

Plaintiff asserts state-law claims pursuant to the Maine Civil Rights Act ("MCRA"), 5 M.R.S. § 4682, and for negligence.  Compl., Cts 2 & 4.[3]  Article 1, § 5 of the Maine Constitution, the provision upon which Plaintiff relies for her MCRA claim, "provides protections that are coextensive with the Fourth Amendment."  *State v. Martin*, 120 A.3d 113, 118 n.2 (Me. 2015).  Because Trooper Parks has qualified immunity from Plaintiff's § 1983 Fourth Amendment claim, he is similarly immune from the MCRA claim.  *See Berube*, 506 F.3d at 85 ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA."); *Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 275 (D. Me. 2010); *see also Jenness v. Nickerson*, 637 A.2d 1152, 1159 (Me. 1994) ("Having found the Officers immune from the section 1983 claims, we also find them immune from claims under the MCRA.").

Plaintiff's negligence claim also fails.  Under the Maine Tort Claims Act, a governmental employee is entitled to immunity when performing a "discretionary function or duty" so long as

---

[3] In Counts 5 and 6, plaintiff asserts claims for "wrongful death" and "conscious pain and suffering," respectively.  Compl. ¶¶ 88–93.  These are not independent claims, but rather simply invoke Maine's wrongful death statute with regard to the substantive claims asserted in Counts 1–4.  *See* Compl. ¶ 106.  Because Trooper Parks is entitled to judgment on all of the substantive claims against him, he is entitled to judgment on Counts 5 and 6 as well.

the act is "reasonably encompassed by the duties of the governmental employee in question."  14

M.R.S. § 8111(1) & (1)(C).  "A law enforcement official's use of force is a discretionary act."

*Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1236 (D. Me. 1996) (citing *Roy*, 42 F.3d at 696

and *Leach v. Betters*, 599 A.2d 424, 426 (Me. 1991)).  An officer is therefore immune from tort

liability for a use of force so long as his use of force does not exceed the scope of his discretion.

*Richards v. Town of Eliot*, 780 A.2d 281, 292 (Me. 2001).  A use of force that is "objectively

reasonable" under the *Graham v. Connor* criteria meets this requirement.  *Id.*  As the First

Circuit stated, if "officers' conduct was reasonable under the circumstances, that conduct cannot

be said to be so egregious as to deprive the officers of the immunity defense, and they are

entitled to summary judgment on the MTCA claim as well."  *Berube*, 506 F.3d at 86; *see also*

*Jackson*, 751 F. Supp. 2d at 276.  Here, for the reasons set forth in Part I.B, above, Trooper

Parks's decision to use deadly force was objectively reasonable.  He is therefore immune from

Plaintiff's negligence claim.

### Conclusion

For the above reasons, the Court should grant summary judgment to Defendant Parks on

all claims in the complaint.

DATED:  January 16, 2020                           AARON M. FREY
                                                   Attorney General


                                                   /s/ Jonathan R. Bolton
                                                   _____
                                                   JONATHAN R. BOLTON
                                                   Assistant Attorney General
                                                   6 State House Station
                                                   Augusta, Maine  04333-0006
                                                   Tel.  (207) 626-8800
                                                   Fax (207) 287-3145
                                                   jonathan.bolton@maine.gov

CERTIFICATE OF SERVICE

I hereby certify that on this, the 16th day of January, 2020, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send a copy of such to counsel of record for all parties to this action.

/s/ Jonathan R. Bolton
Jonathan R. Bolton
Assistant Attorney General
6 State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
jonathan.bolton@maine.gov