## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

JESSICA L. FAGRE, as personal ) No. 1:19-cv-83-LEW
Representative of the Estate of )
AMBROSHIA E. FAGRE )
)
   v. )
)
SCOTT W. IRELAND, et al )

## PLAINTIFF'S RESPONSE TO DEFENDANT PARKS' MOTION
## FOR SUMMARY JUDGMENT

The Court should deny summary judgment because there are material issues of material fact as to whether Trooper Parks knew Amber inside the passenger compartment of the Durango when he fired several shots into the windshield, and one into the passenger-side window, and whether Trooper Parks was in imminent danger at the time he fired the shots.

## I.  STATEMENT OF FACTS

1. **Trooper Parks is not in imminent danger when he fires several shots at the Dodge Durango.** Trooper Parks is standing off the roadway on a 3-4 foot high snowbank. (Ireland depo p. 8-9); (Gagnon

depo. 9). His police cruiser is blocking the road in front of him. (Parks depo at p. 73) (Parks Depo Ex. 2). The Durango never drives in the direction of the snowbank where Trooper Parks is standing. (Parks depo at p. 39, 93). Trooper Parks fires several shots into the Durango as it drives towards the parked cruiser. (*Id.* at 36) He continues to fire one or more shots after the Durango struck the cruiser and as it was passing him by. (*Id.* at 40, 73). One of the shots kills Ambroshia Fagre (Amber).

2.   **Trooper Parks knows Amber is a passenger in the Durango.** Prior to the shooting, Lt. Arnold makes several communications over the Maine State Police radio frequency that he is at the Durango with a female passenger. (Ireland depo at 20, 21-22).

On his way to the Arnold Road, Trooper Parks receives a radio communication that Lt. Ireland located a vehicle with a female suspect inside. (Parks depo at p. 8). The radio communication indicates the female is located inside the Durango. (*Id.* at 19). When Trooper Parks first arrives at the location of the Durango, he sees a female, later identified Amber, sitting in the passenger seat of the Durango and

talking to Chief Brown. (Parks Interrogatory par. 1.); (Parks Depo at p. 11, 14, 17).

After leaving the location of the Durango for approximately 17 minutes, Trooper Parks returns. The Durango is parked in same location as when he left earlier. (Parks depo at p. 23, 29). Trooper Parks never receives any information Amber has been moved from the Durango. (*Id.* at 24, 30). Trooper Parks never sees Amber outside of the Durango. (*Id.* at 30).

3. **Trooper Parkers' Cruiser is Blocking the Roadway.** Upon arriving back at the location of the Durango, Trooper Parks stops his cruiser in roadway with couple of feet on each side between cruiser and snowbanks. (*Id.* at 26). The Arnold Road is a narrow roadway with not enough room for two cars to pass each other. (*Id.* at 25). Trooper Parks gets out of the cruiser after stopping it and hearing gunshots. (*Id.* at 26). Trooper Parks first moves to the rear of his cruiser. (*Id.* at 28).

4. **Trooper Parks is standing in a position of safety on top a snowbank of the blocked roadway.** The Durango turns onto the Arnold Road towards the cruiser blocking the roadway. (*Id.* at 33).

Trooper Parks moves up onto snowbank and out of roadway once the Durango starts moving. (*Id.* at 35). Trooper Parks is standing on snowbank off the roadway behind the parked cruiser. (*Id.* at 37-38, 71) (Parks Depo Ex. 2). The Durango is in front of Trooper Parks and his parked cruiser when Trooper Parks gets up on snowbank off the road. (Parks depo at p. 35). The snowbank is off the roadway a couple feet from the parked cruiser. (*Id.* at 39). Trooper Parks is standing on snowbank to rear driver-side of the parked cruiser. (*Id.* at 67).

5. **Trooper Parks can see clearly into the front passenger cab of the Durango when he fires the shots.** It is light outside with clear visibility when the Durango drives towards the cruiser. (*Id.* at 34). There is nothing obstructing Trooper Parks' view of the Durango once he is standing on the snowbank. (*Id.* at 43).

Trooper Parks can see inside the driver-side cab of Durango from his position on snowbank. (*Id.* at 44). Trooper Parks can see inside the passenger-side of the Durango. (*Id.*). Amber is inside the passenger compartment of the Durango as the shots are fired. (Gagnon depo. at 76-77) (MSP Photos 544, 547, 549). Trooper Parks fires multiple shots at

the Durango as it heads towards the parked cruiser. (Parks' depo. at 36). Many of the shots fired by Trooper Parks hit the passenger side windshield of the Durango. (Parks depo. at 41, 66, 67, 68) (Parks Dep. Ex. 4 & 5) (Gagnon depo at p. 14, 15, 22, 25).

6. **Trooper Parks is in a safe location when he fires the shots.** The parked cruiser is blocking the Durango's path to Trooper Parks, who is standing on a snowbank off the road behind the cruiser. (Parks depo at 73) (Parks Depo Ex. 2).

The Durango never moves towards the snowbank where Trooper Parks is standing. (Parks depo. At p 39, 93). The Durango turns slightly away from Trooper Parks' position on the snowbank.  (*Id.* at 93).

At the time Trooper Parks fires the shots, Trooper Parks is unaware of who fired the shots he previously heard when arriving back at the location of the Durango. (*Id.* at 64). No shots are ever fired at Trooper Parks. (*Id.*). No one ever attempts to fire any shots at Trooper Parks. (*Id.*). Trooper Parks has no information Amber ever used force against anyone, or committed any crime. (*Id.*).

7. T**rooper Parks continues to fire after the Durango hits the cruiser and passes his location.** The Durango hits the parked cruiser while Trooper Parks is standing on the snowbank. (*Id.* at 40). Trooper Parks continues to fire one or more shots after the Durango hits the cruiser and moves passed Trooper Parks' location on the snowbank. (*Id.* at 40, 73). One of the shots fired by Trooper Parks is into the passenger side window of the Durango and enters the upper portion of the passenger side window. (*Id.* at 41-42) (Gagnon depo at 14, 30-31).

8. **The Durango is not at risk of escaping or hurting anyone as it drives towards the parked cruiser.** The Arnold Road is a dead end dirt road with no pedestrian or foot traffic and light vehicle traffic. (Parks depo at p. 63). In the winter time, the Arnold Road is barely wider than one vehicle. (Ireland depo at p. 8). On February 10th, 2017, the snowbanks on the sides of the Arnold Road were at least three feet high. (*Id.* at 8-9); (Gagnon depo at p. 9).

There are no officers, or people, in the path of the Durango as it drIveS towards the parked cruiser. (Parks depo at p. 63). Trooper Parks

can see no officers are holding onto the Durango while it starts driving down the Arnold Road. (*Id.* at 64).

9. **Amber is inside the front passenger cab when she is shot by Trooper Parks.** After firing the shots, Trooper Parks approaches the Durango and sees a male occupant in the driver seat, and Amber in the front passenger side of the cab. (Parks depo at p. 49). Amber is slumped over towards the driver. (*Id.* at 53).

Throughout the events, and during the shooting, Amber is always in the front passenger cab of the Durango. Amber is sitting in the passenger side of the Durango when Chief Brown first arrives at the Arnold Road and throughout his interactions with her. (Brown depo. at 12-13, 17-18, 23, 62).

Moments before Trooper Parks stops his cruiser and fires the shot, Chief Brown receives a radio call that the suspect is coming in his direction. (*Id.* at 28). Amber is sitting in the passenger seat when Chief Brown receives this information. (*Id.* at 29). Chief Brown moves around front of the Durango to take cover as the suspect approaches. (*Id.* at 30). Amber is still sitting in the passenger seat at this time. (*Id.*). Chief

Brown sees Amber sitting in the passenger seat facing forward the entire time he was at the Durango up until the shooting started. (*Id.* at 34).

After Lt. Ireland shoots the driver, Mr. Bailey, Sergeant Mills and Lt. Ireland approach the Durango and shout for the passenger to show her hands. (Ireland depo at p. 48). Amber is laying across the center console and Mr. Bailey is in the driver seat when Lt. Ireland approaches the Durango immediately after the shooting. (*Id.* at 52).

II.  **STANDARD OF REVIEW.**

The Court should only grant summary judgment if the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

A fact is "material" if it "'has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94

(1st Cir. 2001) (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

"Genuine" means "'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Id.*

At the summary judgment phase, the Court "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prod.*, 530 U.S. 133, 150 (2000)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51, 106 S.Ct. 2505 (1986)).

III.       **LAW & ARGUMENT**

The Court should deny summary judgment because there are material issues of material fact that show Trooper Parks knew Amber was in the passenger cab when he shot into the Durango, and Trooper

Parks was not in imminent danger at the time he fired into the Durango and killed Amber.

### A.   A Law Enforcement Officer Can Only Use Deadly Force if he is in Immediate Danger.

A law enforcement officers violates a person's rights under the Fourth Amendment if the officer uses more force than is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). "[T]he use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." *Jarrett v. Town of Yarmouth*, 331 F. 3d 140, 149 (1st Cir. 2003).

An officer must have "probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others" to justify the use of deadly force. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

Trooper Parks fired shots into the Durango at a time when there was no imminent threat to Trooper or anyone else. Trooper Parks was in a position of safety off the road on top of a snowbank with the cruiser blocking the roadway in front of him. As the Durango drove

down the road, it turned away from Trooper Parks' position on top of the snowbank and crashed into the parked cruiser coming to a stop. Furthermore, the Durango was not in a position to escape as Trooper Parks' unoccupied cruiser was blocking the roadway.

B.  **Qualified Immunity Does Not Shield an Officer From Violating Clearly Established Law.**

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The First Circuit has determined the existence of qualified immunity by a two-part test: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

Clearly establishing the existence of the right does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also White v. Pauly*, 137 S. Ct. 548, 551 (2017).

"To determine the contours of a particular right at a given point in time, an inquiring court must look not only to Supreme Court precedent but to all available case law." *Hatch v. Dep't for Children, Youth and Their Families*, 274 F.3d 12 (1st Cir. 2001).

The Court may also look to and consider precedent from other jurisdiction in determining whether the right was clearly established. "[W]e are not inclined to adopt either a hard-and-fast rule that precedent from another circuit is always determinative of whether a law is clearly established . . . or a rule that such precedent is always irrelevant . . . . Among other factors, the location and level of the precedent, its date, its persuasive force, and its level of factual similarity to the facts before this Court may all be pertinent to whether a particular precedent 'clearly establishes' law for the purposes of a

qualified immunity analysis." *El Dia, Inc. v. Rossello*, 165 F.3d 106, 110 n. 3 (1st Cir. 1999).

As set forth later in the memorandum, Trooper Parks violated clearly established law by using deadly force against the occupants of the Durango at a time when he was in no immediate danger.

### C.  Trooper Parks Seized Amber by Firing Several Shots into the Durango in Which She Was a Passenger In.

Trooper Parks seized Amber under the Fourth Amendment by firing several shots into the Durango in which she was a passenger with the intent of stopping the Durango.

The Supreme Court has held: "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied [.] Thus, an unintended person ... may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act." *Brendlin v. California*, 127 S.Ct. 2400, 2405  (2007) (internal citations and quotations omitted).

Trooper Parks' intentional actions of firing several shots into the Durango in an effort to stop it constitutes a seizure of all of its occupants, including Amber. The Trooper did not need to intend to shoot Amber in order to seize her. The intentional act of shooting the Durango is a seizure that consequentially led to Amber being fatally shot.

The First Circuit case of *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990) is no longer good law in light of the holding in *Brendlin*. Moreover, the circumstances in *Landol-Rivera* arre distinguishable as the officer in that case was reasonable in using deadly force against the vehicle or robber. In this case, it was unreasonable for the Trooper to use deadly force against the Durango or its occupants.

The Third Circuit has suggested the Supreme Court's decision in *Brendlin* calls into question the holding of *Landol-Rivera* that only the intended target of the shooting is seized. *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017). Other Circuits have held that following *Brendlin* a passenger in Amber's situation can recover for an unlawful seizure. *Lytle v. Bexar Cty.*, 560 F.3d 404, 410 (5th Cir.

2009); *Vaughan v. Cox*, 343 F.3d 1323, 1328-29 (11th Cir. 2003); *Fisher v. City of Memphis*, 234 F.3d 312, 318-19 (6th Cir. 2000); *Pittman v. Nelms*, 87 F.3d 116, 120 (4th Cir. 1996).

For example, in *Fisher v. City of Memphis*, 234 F.3d 312, 2 318-19 (6th Cir. 2000), the Court held: "Therefore, violation of the Fourth Amendment requires an intentional acquisition of physical control. As a result, a seizure occurs even when an unintended person or thing is the object of the detention or taking, so long as the detention or taking itself is willful." *Id.* at 318. "Here, Becton's car was the intended target of Defendant's intentionally applied exertion of force. By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff." *Id.* at 318-319. The same holds true in this case. In shooting the Durango and its driver, the Trooper intended to seize all occupants, including Amber.

All of the Circuits that are at odds with the above holdings were before the *Brendlin* decision, including *Landol-Rivera*.

Therefore, the Court should find the Trooper's intentional shooting of the Durango and its driver effectively seized all occupants of the Durango, including Amber.

D.   **Trooper Park's Seizure of Amber was Unreasonable and Clearly Established at the Time.**

Trooper Parks' use of force was unreasonable because Amber posed no threat to Trooper Parks at the time he used deadly force. The Trooper was in a position of safety off the roadway and atop a 3-4 foot high snowbank with the parked cruiser ahead of him blocking the roadway. Firing into the Durango from his position of safety amounts to unreasonable force under clearly established law, because the officer was in no imminent danger at the time he deployed deadly force.

The First Circuit has addressed the use of deadly force in a case involving a moving vehicle. In *Mitchell v. Miller*, 790 F. 3d 73, 80 (1st Cir. 2015), the Court found qualified immunity for an officer who shot a suspect as he sped away in a car. "[T]he test is not whether a person was actually directly in the path of the car, but whether it was reasonable for Miller to believe—at the point when events were

rapidly unfolding—that someone was at risk of serious physical harm."

In this case, it was not reasonable for the Trooper to believe anyone was in danger of serious harm. No one was in the path of the Durango when it drove down the Arnold Road. The Trooper was standing off the roadway on a 3-4 foot high snow bank. The parked cruiser was blocking the roadway in front of the Trooper's location. And the Durango never turned towards the Trooper's position on the snowbank, but rather turned slightly away.

The facts in *Miller* are quite different from this case. In *Miller*: "Both men were standing close to the Jetta at the point at which Mitchell threw the car into a rapid, tight U-turn, and Miller was still holding onto the car's door at the time." *Id.* at 80.

The case of *Brosseau v. Haugen*, 543 US 194 (2004) is different than this case where the officer was granted qualified immunity for shooting at a vehicle as it sped away because the officer was "`fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [Haugen's] path and for any

other citizens who might be in the area.'" *Id.* at 195. Here, Trooper Parks did not fire shots into the Durango to protect anyone else. Trooper Parks himself was in a position of safety when he fired the shots.

The material issue of fact as to whether Trooper Parks knew Amber was inside the passenger cab of the Durango is important to the reasonableness of the use of force. The Supreme Court has made a distinction between subjective intent and objective intent in deadly force cases. The Court stated that "we do not think it practicable to conduct … an inquiry into subjective intent." *Brower*, 109 S.Ct. at 1382. In *Graham v. Connor*, 490 U.S. 386 (1989), the Court stated: "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional".

There is a material issue of fact as to whether Trooper Parks knew Amber was in the Durango when he fired several shots into the Durango.

- Trooper Parks received radio communications that Amber was a passenger in the Durango.

- He saw Amber sitting in the Durango approximately 17 minutes before the shooting.

- He received no subsequent information that she had been removed from the Durango.

- Trooper Parks admitted he could see clearly into the passenger cab of the Durango as he was firing shots.

- Chief Brown saw Amber in the passenger seat seconds before the Durango was shot at by Trooper Parks.

- Immediately following the shooting, Amber is found sitting slumped over inside the front passenger seat.

- Detective Gagnon opined Amber was in the front passenger cab when shot.

The objective act of firing into a moving vehicle the officer knows is carrying an innocent passenger shows an intent to seize both passengers through the use of force and is unreasonable under these circumstances.

It is significant that Trooper Parks fired a shot into the passenger-side window at the time the Durango was passing by his position on the snowbank. In *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005), the Court

reasoned that if a deputy sheriff fired a final fatal shot at an arrestee fleeing in a stolen police car after the vehicle passed him, he violated the arrestee's constitutional rights.

Similarly, in *Sigley v. City of Parma Heights*, 437 F.3d 527 (6th Cir. 2006), the court ruled that the use of deadly force to shoot and kill a suspect fleeing from the scene of an undercover drug bust was only justified if, at the time of the shooting, the suspect's vehicle posed an imminent danger to officers.

The Durango was posing not imminent danger to the Trooper at the time he deployed deadly force, including the final shot into the passenger side window as it was passing him by.[1]

Mr. Bailey's prior bad acts did not justify Trooper Parks' use of deadly force at the time it was deployed. The caselaw supports the conclusion that an officer does not retain the right to use deadly force based on a suspects prior actions that have now ceased. In *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993), the Seventh Circuit

---

[1] It is unknown in this case which shot was the fatal shot that killed Amber. The shot into the passenger side window cannot be ruled out as the fatal shot.

recognized as clearly established that a threatening situation may abate over time and as that happens, the reasonableness of an officer's justification in using deadly force may wane.

The Fifth Circuit has held a fleeing motor vehicle does not create a *per se* rule for the use of deadly force. In *Lytle v. Bexar County, Tex.*, 560 F. 3d 404 (5th Cir. 2009), the Court denied qualified immunity because "[the officer] could have had sufficient time to perceive that any threat to him had passed by the time he fired." *Id.* at 414 "As these decisions indicate, a suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is per se reasonable. In assessing the reasonableness of a police officer's use of force, we must instead delve into the facts and circumstances of each case." *Id.* at 416.

In this case, the circumstances make the Trooper's use of force unreasonable.

- The Durango was blocked by the parked cruiser on the narrow road with 3-4 foot heigh snowbanks.

- The officer was standing off the road on top of a snowbank.

- The officer was located behind the parked cruiser blocking the road.

- The Durango turned slightly away from the officers position on the snowbank.

"It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others. This holds as both a general matter, and in the more specific context of shooting a suspect fleeing in a motor vehicle. The right in question was therefore clearly established on February 28, 2006, and this is sufficient to affirmatively answer the qualified immunity question of our inquiry." *Id.* at 417-18 (internal citations and quotations omitted).

In *Vaughan v. Cox*, 343 F.3d 1323, 1326-27 (11th Cir. 2003), a police officer shot a passenger in a fleeing vehicle after a suspect had led police on a highway chase exceeding eighty miles per hour and had collided with a police cruiser. The Eleventh Circuit found that "[g]enuine issues of material fact remain[ed] as to whether [the suspects'] flight presented an immediate threat of serious harm to [the

police officer] or others at the time [the officer] fired the shot." *Id.* at 1330.

The present case presents the same factual questions of immediate harm to the Trooper at the time he used deadly force against Amber inside the Durango. Therefore, the Court should deny summary judgement on all counts against Trooper Parks.[2]

Dated: February 18, 2020

Respectfully submitted,

/s/ Hunter J. Tzovarras
Hunter J. Tzovarras, Esq.
Pelletier Faircloth & Braccio LLC
88 Hammond Street, Suite 321
Bangor, Maine 04401
office: (207) 941-8443
fax: (207) 941-0064
hunter@bangorlegal.com

_____

[2] For all the reasons set forth previously as the unreasonableness of the Trooper's use of deadly force, the Court should deny summary judgment on the State law claims.

**CERTIFICATE OF SERVICE**

I hereby certify I filed the the above motion using ECF on February 18, 2020 causing a copy to be sent to:

Jonathan Bolton
Assistant Attorney General
Office of the Attorney General
Litigation Division
6 State House Station
Augusta, ME 04333-0006

Edward R. Benjamin, Jr., Esq.
Kasia S. Park, Esq.
Drummond Woodsum & MacMahon
84 Marginal Way, Suite 600
Portland, ME
(207) 772-1941

/s/ Hunter J Tzovarras