UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JESSICA L. FAGRE, as the Personal Representative of the Estate OF AMBROSHIA E. FAGRE, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:19-cv-00083-LEW |
| v. | ) ) | |
| JEFFREY PARKS, | ) ) | |
| Defendant. | | |

## ORDER ON DEFENDANT JEFFREY PARKS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Jessica Fagre, as personal representative of the Estate of Ambroshia ("Amber") Fagre, brings civil rights claims under 42 U.S.C. § 1983 and related provisions of state law against Maine State Police Trooper Jeffrey Parks for firing the shot that eventually killed Amber Fagre on February 10, 2017. Plaintiff alleges that Mr. Parks violated Amber Fagre's rights when he fired his service weapon at the driver of the car in which Ms. Fagre was a passenger. I now address Defendant Parks' Motion for Summary Judgment. ECF No. 41. Mr. Parks argues that he is entitled to judgment as a matter of law on Plaintiff's state and federal claims because he did not violate Ms. Fagre's Fourth Amendment Rights, and, alternatively, because he is entitled to immunity from suit. For the reasons that follow, Mr. Parks' Motion is GRANTED, and this case is DISMISSED.

## SUMMARY JUDGMENT FACTS

The summary judgment facts are drawn from the parties' stipulations, if any, and from their statements of material facts submitted in accordance with Local Rule 56. The Court will adopt a statement of fact if it is admitted by the opposing party and is material to the dispute. If a statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference. D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018).

The facts leading up to the shooting are undisputed. On February 10, 2017, off-duty Maine State Police Lieutenant Scott Ireland was notified by his neighbor that a suspicious Dodge Durango was parked on the neighbor's property in Vassalboro, Maine. Defendant's Statement of Undisputed Material Fact ("DSUMF"), ECF No. 40, ¶¶ 1-3. In response to his neighbor's concern, Lieutenant Ireland drove his police cruiser to his neighbor's home to investigate. *Id.* ¶ 4. Upon arrival, Lieutenant Ireland observed a Dodge Durango parked in a turnaround on Arnold Road, a narrow dirt road with about a dozen homes. *Id.* ¶¶ 11-13. Inside the vehicle he found a woman in the passenger seat slumped over and seemingly unconscious. *Id.* ¶ 4. Lieutenant Ireland approached the vehicle, pounded on the passenger window, and, once the woman was awake, asked her to get out of the car. *Id.* ¶¶ 6-7. The

woman, Ambroshia ("Amber") Fagre, was initially unable or unwilling to explain why she was there, or where the driver of the Durango had gone. *Id.* ¶ 6. The Lieutenant suspected she and her companion were breaking into homes on Arnold Road based on footprints leading to nearby houses. *Id.* ¶ 7. He reported this suspicion over his cruiser's radio, then resumed questioning Ms. Fagre, who ultimately admitted the driver was breaking into residences. *Id.* ¶ 9.

Lieutenant Ireland then made several phone calls in an attempt to determine the safety of Arnold Road residents. *Id.* ¶ 18. Meanwhile, Sergeant Galen Estes of the Kennebec County Sheriff's Office joined Lieutenant Ireland, informing him he was there to investigate a burglary in the area. *Id.* ¶ 20. Lieutenant Ireland learned from Sergeant Estes that a nearby homeowner had been tied up at gunpoint and had his home ransacked, and he reported as much over his cruiser's radio. *Id.* ¶¶ 18-19. He went to the home to investigate while Sergeant Estes stayed with Amber Fagre at the Durango. *Id.* ¶ 22. Shortly thereafter Vassalboro Police Chief, Mark Brown and Maine State Police Trooper, Jeffrey Parks joined Sergeant Estes on the scene. *Id.* ¶¶ 22, 27.

At the home, Lieutenant Ireland learned that Kadhar Bailey, later identified as Ms. Fagre's boyfriend and the driver of the Durango, had held the homeowner at gunpoint, ransacked the house, and fled in the homeowner's pickup truck. *Id.* ¶ 24. Following a tip from a neighbor, Lieutenant Ireland and Sergeant Estes then drove to the south end of Arnold Road where a man fitting Mr. Bailey's description had been spotted. *Id.* ¶¶ 41-42. Chief Brown stayed with Ms. Fagre and the Durango. *Id.* ¶ 43. After searching the area surrounding the neighbor's house, Lieutenant Ireland spotted Mr. Bailey running through

the woods in the direction of the Durango. *Id*. ¶ 45. Sergeant Estes radioed Chief Brown and updated him regarding the home invasion and his belief that Mr. Bailey was heading toward the Durango and was armed. *Id.* ¶ 46.

Chief Brown, still with Ms. Fagre near the Durango, then saw Mr. Bailey approaching with a handgun, identified himself as a police officer, drew his own firearm, and ordered Mr. Bailey to stop. *Id.* ¶¶ 50-51. Despite Chief Brown's commands, Mr. Bailey continued to approach. *Id.* ¶ 50. Chief Brown took cover behind a snowbank and exchanged gunfire with Mr. Bailey. *Id.* ¶¶ 51-52. Mr. Bailey got in the Durango, and began to drive westbound down Arnold Road toward Webber Pond Road. *Id.* ¶ 53. Chief Brown fired at least two additional shots toward the driver's side door of the Durango as it drove away. *Id.* ¶ 54.

Meanwhile, Trooper Parks was conducting safety checks at nearby residences on Fairway Drive, parallel to Arnold Road. *Id.* ¶ 39. He had heard the reports of Mr. Brown's armed burglary on the radio, and was checking the Fairway Drive houses at Lieutenant Ireland's request. *Id.* ¶ 29. Upon learning the suspect had been located, Trooper Parks returned to Arnold Road. *Id.* ¶ 59. On arrival, he heard gunshots coming from the direction of the Durango, stopped his police cruiser on Arnold Road about 75 feet away, and got out of his vehicle, taking cover near the rear. *Id.* ¶¶ 60-62, 65. The high snowbanks made it impossible for another vehicle to get by Trooper Parks' cruiser on Arnold Road. *Id.* ¶ 69. From his vantage point, Trooper Parks saw Mr. Bailey get into the Durango, rev the engine, and rapidly accelerate down Arnold Road toward his cruiser; given the speed, it became clear that Mr. Bailey was preparing to ram his parked car. *Id.* ¶ 70. Taking cover, Trooper

4

Parks moved behind a snowbank on the passenger side of the approaching Durango. *Id.* ¶ 71. Trooper Parks fired six or seven shots through the oncoming Durango's windshield, which ultimately rammed his police cruiser, sending it some 50 feet past Trooper Parks' perch on the snowbank. *Id.* ¶¶ 70-79, 81. The parties agree that Trooper Parks did not have time to issue a warning to the driver, and that Mr. Bailey would not have been able to hear the warning regardless, given the Durango's revved engine. *Id.* ¶¶ 76-77; Pl.'s Resp. to DSUMF, ECF No. 47, ¶¶ 76-77. The parties, likewise, agree that Trooper Parks could not see anyone other than Mr. Bailey in the Durango as it approached him at high speed on Arnold Road. *Id.* ¶ 86.

Once the Durango had come to a stop, Lieutenant Ireland approached the driver's side of the Durango. *Id.* ¶ 92. When he observed Mr. Bailey reaching for something in the vehicle, Lieutenant Ireland fired a shot at Mr. Bailey, killing him. *Id*. A search of the Durango following the incident revealed a .32 caliber semi-automatic pistol between the driver's seat and center console, with one bullet in the chamber and two in the magazine. *Id.* ¶ 101. Subsequent investigation also revealed that Trooper Parks fired the shot that wounded and ultimately killed Amber Fagre. *Id.* ¶ 96. It is that gunshot that is now at issue.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As cautioned by the Supreme Court, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A material fact is one that has the potential to determine the outcome of the litigation. *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). To raise a genuine issue of material fact, the party opposing the summary judgment motion must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in his favor. *See Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

Excessive use of force by law enforcement strikes at the heart of the people's right to be "secure in their persons…against unreasonable searches and seizures." U.S. Const. Amend. IV. In Count One, the Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging that Trooper Parks used excessive force against Amber Fagre in violation of this Fourth Amendment right: she argues that when Trooper Parks mistakenly shot Ms. Fagre with one of the six or seven bullets he fired at the driver of the oncoming Durango, he unlawfully "seized" her in violation of the Fourth Amendment. Trooper Parks' Motion for Summary Judgment makes two arguments against liability under Count One. First, he argues that he did not "seize" Amber Fagre at all, and is therefore not subject to suit under § 1983. Second, he argues that even if he did violate Ms. Fagre's Fourth Amendment rights by unconstitutionally "seizing" her, he is entitled to qualified immunity from suit.

The Plaintiff also brings state law claims against Trooper Parks. Count Two of her Complaint alleges Trooper Parks violated the Maine Civil Rights Act ("MCRA"), 5 M.R.S.

6

§ 4682, and Count Four claims Trooper Parks acted negligently in violation of Maine state law. Trooper Parks, meanwhile, argues he is immune from Count Two for the same reasons he is immune from Count One, and that he is immune from Count Four under the Maine Tort Claims Act, 14 M.R.S. § 8111(1) & (1)(C). I consider these arguments in turn.

### A. FOURTH AMENDMENT SEIZURE

Trooper Parks first argues that he is entitled to summary judgment on Plaintiff's § 1983 claim because he did not violate Amber Fagre's constitutional rights at all.[1] To state a claim under § 1983 for excessive use of force in violation of the Fourth Amendment, a plaintiff must demonstrate that a "seizure" occurred, and that the seizure was "unreasonable." *Brower v. Cty. of Inyo*, 489 U.S. 593, 599 (1989). The Supreme Court has yet to lay down a bright-line rule in a situation like this one, where a law enforcement officer unintentionally shoots a vehicle's passenger when aiming for its driver. *See Plumhoff v. Rickard*, 572 U.S. 765, 778, n.4 (2014) (noting "some disagreement among lower courts as to whether a passenger in [Amber Fagre]'s situation can recover under a Fourth Amendment theory," but "express[ing] no view on this question").

This disagreement grows out of conflicting lines of Fourth Amendment case law. On one hand, the Supreme Court has held that the police officer must *intentionally* enact the seizure to violate an individual's Fourth Amendment rights. *Brower,* 489 U.S. at 597.

---

[1] I tackle this question first, rather than simply resolving this case on the grounds of qualified immunity, in line with the Supreme Court's guidance in *Pearson v. Callahan*. 555 U.S. 223, 231 (2009) (noting that doing so "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable"); *see also Plumhoff,* 572 U.S. at 774 (suggesting beginning with the threshold constitutional question because it is "beneficial in develop[ing] constitutional precedent in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense") (internal citations omitted).

7

So, for example, in the context of a passenger who died in a vehicle stopped by a police roadblock:

> [A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement…, nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement…, but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Id.* (emphasis in original). The First Circuit has applied this logic to the context of a police officer firing into the car of a fleeing suspect, reasoning that "[a] police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern." *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990). That is to say, if the police officer fires at the driver—but hits the passenger—the officer does not enact a Fourth Amendment "seizure" of the passenger.

On the other hand, sister circuits have suggested that more recent Supreme Court decisions call into question *Landol-Rivera*'s application of the *Brower* rule to an unintended gunshot victim. For example, in *Brendlin v. California*, the Supreme Court held that in intentionally stopping a vehicle, an officer subjects not only the driver, but also the vehicle's passengers to a Fourth Amendment seizure. 551 U.S. 249, 254-56 (2007). The Court also made clear that an officer's knowledge of a passenger's presence in the vehicle is not dispositive because "an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act." *Id*. at 254 (alterations and internal quotation marks omitted). In light of the Supreme Court rule in *Brendlin,* Plaintiff suggests *Landol-Rivera* "is no longer good law." Pl.'s Resp at

8

14. Plaintiff argues this Court should follow the Third Circuit instead, which has suggested that pre-*Brendlin* decisions are outdated, and that a Fourth Amendment seizure has occurred when passengers are unintentionally shot by police during a pursuit. *See Davenport v. Borough of Homestead,* 870 F.3d 273, 279 (3d Cir. 2017) (noting that "because [the passenger's] freedom of movement was terminated by the very instrumentality set in motion or put in place in order to achieve [the driver]'s and [the passenger's] detention…there is no set of facts that precludes a finding of a Fourth Amendment seizure") (internal quotations and citation omitted).

Notwithstanding Plaintiff's argument, First Circuit precedent controls the outcome of this case. Even after *Brendlin*, this Circuit has continued to cite *Landol-Rivera* with approval for the proposition that "[i]t is intervention directed at a specific individual that furnishes the basis for a Fourth Amendment claim." *Stamps v. Town of Framingham,* 813 F.3d 27, 37 (1st Cir. 2016) (citing *Landol-Rivera,* 906 F.2d at 796). In *Landol-Rivera* the court held a police officer's bullet intended for a fleeing driver—but which mistakenly hit the passenger—did not give rise to a Fourth Amendment claim under § 1983. 906 F.2d at 796. And here, as in *Landol-Rivera*, there is no basis for the plaintiff's Fourth Amendment claim. Plaintiff in this case alleges that Defendant Parks violated the decedent-passenger's Fourth Amendment rights by accidentally shooting her while firing his gun at someone else—the armed and dangerous driver of a vehicle. DSUMF ¶¶ 70-79, 81. The parties agree that "Trooper Parks aimed all of his shots at the driver," not at Amber Fagre. DSUMF ¶ 80; Pl.'s Resp to DSUMF ¶ 80. Therefore, in line with *Landol-Rivera*, I find

Trooper Parks did not "seize" Amber Fagre when she was shot inadvertently during his attempts to stop the driver of the oncoming Durango, Mr. Bailey.

Not only does First Circuit precedent control the outcome of this case, but I pause here to underscore that *Brendlin* does not change the analysis of *Landol-Rivera*. The Supreme Court's rule in *Brendlin* applies specifically to the context of a traditional traffic stop, where an officer intentionally seizes a vehicle through some show of force, and by extension both its driver and all its passengers. *Id*. at 255-56. *Landol-Rivera*, however, deals with a police shooting, and whether that officer intended to fire at the victim. 906 F.2d at 794. In *Brendlin,* the officer uses "means intentionally applied"—sirens, roadblocks, etc.—to "terminat[e] freedom of movement" of a vehicle, and these means are directed to everyone inside the vehicle. In *Landol-Rivera*, by contrast, the officer did not intend to assert any physical control over the passenger. It was uncontroverted in that case, as here, that the officer was shooting at someone else, and struck the plaintiff instead. The Supreme Court's recognition in *Brendlin* that traffic stops "intentionally" seize all occupants of a vehicle does not mean an officer's gunshot "intentionally" seizes a victim he or she does not aim at in the first place.

Because Trooper Parks did not intend to fire at Amber Fagre, he did not "seize" her, and thus did not violate her rights under the Fourth Amendment as articulated by the Supreme Court and the First Circuit. For this reason, I find he is entitled to judgment as a matter of law on Count One, and that the Plaintiff cannot make out a claim of excessive force under § 1983.

### B. QUALIFIED IMMUNITY

Even assuming Trooper Parks "seized" Amber Fagre on February 10, 2017, I find that Trooper Parks would be entitled to qualified immunity from § 1983 liability. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The test for determining qualified immunity at the summary judgment stage has two parts. First, I consider whether "the facts, taken most favorably to the party opposing summary judgment, make out a constitutional violation." *Ford v. Bender*, 768 F.3d 15, 23 (1st Cir. 2014). Second, the court considers "whether the violated right was clearly established at the time that the offending conduct occurred." *Id.* The Court has discretion as to which prong of the analysis to consider first. *Conlogue v. Hamilton*, 906 F.3d 150, 155 (1st Cir. 2018).

I begin with the second prong, which the First Circuit has split into two parts. First, a plaintiff must identify either controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm. *McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017). Second, a plaintiff must show that "an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law." *Id.* Because many law enforcement encounters arise from confusing, high-stakes circumstances, this second inquiry provides some breathing

room for a police officer even if he has made a mistake (albeit a reasonable one) about the lawfulness of his conduct. *See Jennings v. Jones*, 499 F.3d 2, 19 (1st Cir. 2007) (noting that this inquiry "affords protection to officers who reasonably, yet mistakenly, employ excessive force in violation of the Fourth Amendment").

As is often the case in the qualified immunity context, how a court defines the "right" at issue goes a long way toward deciding whether it was "clearly established" at the time of the alleged violation. As discussed in more detail above, whether unintentional crossfire directed at a driver but instead hitting a passenger qualifies as a "seizure" was far from "clearly established" on February 10, 2017. As recently as 2014 the Supreme Court noted "some disagreement among lower courts" as to whether a passenger in Ms. Fagre's situation could recover under a Fourth Amendment theory. *Plumhoff,* 572 U.S. 765, 778, n.4 (collecting cases on both sides); *see also Davenport* 870 F.3d at 279 (noting, in August of 2017, the conflict between Fourth, Fifth, Sixth, and Eleventh Circuits and the First and Tenth Circuits on the question).

In light of this contradictory case law, Plaintiff has failed to carry her burden to show such a right was "clearly established" on February 10, 2017. Conflict between Circuits over whether an officer's unintentional shooting of a passenger in a fleeing vehicle violates the Fourth Amendment is far from the kind of "controlling authority or a consensus of persuasive authority sufficient to put an officer on notice that his conduct fell short of the constitutional norm." *Conlogue*, 906 F.3d at 155 (1st Cir. 2018). And because the existence of the right is murky, Plaintiff cannot show that "an objectively reasonable officer would know that his conduct violated [Amber Fagre's Fourth Amendment rights]." *Id.* In

all, I find that the conflicting lines of case law, and the First Circuit's continued reliance on the rule announced in *Landol-Rivera* insulate Trooper Parks from liability under a qualified immunity analysis. Even if he violated Ms. Fagre's Fourth Amendment rights, I find he is entitled to judgment as a matter of law on Count One on qualified immunity grounds as well.

### C. STATE LAW CLAIMS.

Plaintiff also asserts state-law claims pursuant to the Maine Civil Rights Act ("MCRA"), 5 M.R.S. § 4682, and for negligence under Maine common law. Article 1, § 5 of the Maine Constitution, the provision upon which Plaintiff relies for her MCRA claim, "provides protections that are coextensive with the Fourth Amendment." *State v. Martin*, 120 A.3d 113, 118, n.2 (Me. 2015). Because Trooper Parks is entitled to qualified immunity from Plaintiff's § 1983 Fourth Amendment claim, he is likewise immune from the MCRA claim. *See Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the MCRA."); *see also Jackson v. Town of Waldoboro*, 751 F. Supp. 2d 263, 275 (D. Me. 2010) (same).

Plaintiff also brings a negligence claim against Trooper Parks, which fails for similar reasons. As Defendant Parks' Motion points out, under the Maine Tort Claims Act, a governmental employee is entitled to immunity when performing a "discretionary function or duty" so long as the act is "reasonably encompassed by the duties of the governmental employee in question." 14 M.R.S. § 8111(1) & (1)(C). "A law enforcement official's use of force is a discretionary act." *Jackson*, 751 F. Supp. 2d at 276. An officer is, therefore, immune from tort liability for a use of force so long as he does not exceed the

scope of his discretion. *Richards v. Town of Eliot*, 780 A.2d 281, 292 (Me. 2001). The Law Court has held that a use of force that is "objectively reasonable" under the federal standard meets this requirement. *Id*. And the First Circuit has echoed that if "officers' conduct was reasonable under the circumstances, that conduct cannot be said to be so egregious as to deprive the officers of the immunity defense, and they are entitled to summary judgment on the MTCA claim as well." *Berube*, 506 F.3d at 86.

To establish a Fourth Amendment violation, a plaintiff must show that the "level of force was objectively unreasonable under the circumstances." *Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 326 (1st Cir. 2015). This reasonableness calculus considers the officer's actions in light of the "totality of circumstances." *Graham v. Connor*, 490 U.S. 386, 397 (1989). In deadly force cases, the primary inquiry is whether "a suspect poses an immediate threat to police officers or civilians." *Conlogue*, 906 F.3d at 156. Other relevant factors include "the severity of the crime at issue" and whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

On Arnold Road on February 10, 2017 there was both an immediate threat to Trooper Parks, and a suspect who was resisting arrest and attempting to evade law enforcement. To begin with, Mr. Bailey drove the Durango at top speed directly at Trooper Parks' police cruiser, collided with the cruiser, and sent it backward down the road roughly 50 feet, narrowly missing Trooper Parks. *See McGrath v. Tavares*, 757 F.3d 20, 28 (1st Cir. 2014) (recognizing that a car can be a deadly weapon); DSUMF ¶¶ 82, 87. Mr. Bailey had also just been in a gunfight with Chief Brown, and Trooper Parks was aware the suspect

was armed and dangerous. DSUMF ¶¶ 29, 52, 62, 101. A reasonable officer in Trooper Parks' position could have feared that Mr. Bailey would shoot him either from inside the approaching Durango or in a confrontation following the collision. In addition, there were more than a dozen homes nearby, both through the woods on Fairway Drive and along the shore of Webber Pond. DSUMF ¶¶ 13–14. Mr. Bailey had just finished breaking into one of these homes and assaulting the occupant; a reasonable officer in Trooper Parks' shoes also has an obligation to protect other potential victims nearby. DSUMF ¶¶ 24, 41.

Despite the fact Trooper Parks knew of Mr. Bailey's armed burglary, the gunfight with Chief Brown, and faced the runaway Durango, Plaintiff argues that "Trooper Parks fired shots into the Durango at a time when there was no imminent threat to Trooper [*sic*] or anyone else." Pl.'s Resp. at 10. But the record does not support Plaintiff's claim. Two controlling authorities with notably similar facts confirm that Trooper Parks' use of deadly force was well clear of reasonable. First, in *Plumhoff v. Rickard*, the victim led police on a high-speed chase, ending it by crashing into a police cruiser. 572 U.S. at 769. As the plaintiff-victim began maneuvering his vehicle to flee the scene, Police fired several shots into the vehicle as it came to a "near standstill," and several more after it returned to the road. *Id*. at 770. The Supreme Court held that the officers' conduct in firing 15 shots at the vehicle was reasonable, noting that the high-speed pursuit posed a "grave public safety risk," and that because the plaintiff "was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 777.

First Circuit precedent also confirms the reasonableness of Trooper Parks' actions. In *McGrath v. Tavares*, for example, an officer used deadly force against a burglary suspect who had led officers on a high-speed chase and then crashed into a stone wall. 757 F.3d 20, 24 (1st Cir. 2014). After crashing into one of the cruisers, the victim drove toward the officers, prompting one of the officers to fire. *Id*. Noting that the officer's "choices were to shoot or risk being run over" and that the suspect would continue to pose a threat to the public if he escaped, the First Circuit concluded that deadly force was reasonable. *Id*. at 28–29.

So too here. By the time he was speeding toward Trooper Parks' cruiser, Mr. Bailey had committed armed robbery, fired shots at Chief Brown, and driven his Durango down Arnold Road at ramming speed. If anything, Mr. Bailey posed an even greater public safety risk than the drivers in *Plumhoff* and *McGrath*. Moreover, as in *Plumhoff* and *McGrath*, the threat had not ended by the time Trooper Parks finished firing his shots. Trooper Parks fired his 6 to 7 shots while the Durango was still in motion and before it had passed him. DSUMF ¶¶ 79, 85. And, like the defendant in *McGrath*, Trooper Parks' options as the Durango sped toward him were "to shoot or risk being run over." 757 F.3d at 28. This situation was made all the more dangerous because Mr. Bailey was armed and had already shown a willingness to fire shots at police officers. In all, Trooper Parks' use of force was at least as reasonable as the uses of force in *Plumhoff* and *McGrath*, if not more so.

For the reasons set forth above I find Trooper Parks' decision to use deadly force was well within the main of "objectively reasonable" as defined by the Supreme Court and

the First Circuit. He is therefore immune from Plaintiff's negligence claim, and I grant him judgment as a matter of law on Count Four.

## CONCLUSION

For the foregoing reasons, Defendant Jeffrey Parks' Motion for Summary Judgment is GRANTED, and this case is DISMISSED.

**SO ORDERED.**

Dated this 5th day of March, 2020.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE
