# United States Court of Appeals
## For the First Circuit

---

No. 20-1343

JESSICA FAGRE, as personal representative of the Estate of
Ambroshia E. Fagre,

Plaintiff, Appellant,

v.

JEFFREY PARKS, Trooper,

Defendant, Appellee,

MARK BROWN, Chief of Police; SCOTT W. IRELAND, Lieutenant,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Lance E. Walker, U.S. District Judge]

---

Before

Lynch and Barron, Circuit Judges,
and Burroughs,* District Judge.

---

Hunter J. Tzovarras, with whom Pelletier Faircloth & Braccio LLC was on brief, for appellant.
Jonathan R. Bolton, Assistant Attorney General of the State of Maine, with whom Aaron M. Frey, Attorney General of the State of Maine, was on brief, for appellee.

---

* Of the District of Massachusetts, sitting by designation.

January 13, 2021

**LYNCH**, **Circuit Judge**. The plaintiff, Jessica Fagre ("Fagre"), acting as the personal representative of the estate of Ambroshia Fagre ("Amber"), appeals from the district court's March 5, 2020 order granting summary judgment on claims related to Amber's death on February 10, 2017. Fagre argues that the district court erred because the defendant, Trooper Jeffrey Parks, violated Amber's rights under the United States and Maine Constitutions when he unintentionally shot and killed her and was not entitled to qualified immunity. She also argues that Trooper Parks committed state law torts against Amber and was not entitled to tort immunity. We affirm.

## I. Facts

On February 10, 2017, at around 4:00 PM, Lieutenant Scott Ireland of the Maine State Police responded to a report of a suspicious vehicle in his neighborhood in Vassalboro, Maine. He arrived at the scene and found Amber Fagre asleep in the passenger seat of a running Dodge Durango. He said he saw footprints in the snow leading from the Durango to a nearby home. He woke Amber up and questioned her. He said she appeared confused and was either unwilling or unable to explain why she was there or where the driver of the Durango had gone. Lt. Ireland believed that Amber and the Durango's driver were breaking into homes. He reported what he had found over the police radio.

- 3 -

Lt. Ireland continued to question Amber. She admitted that the Durango's driver was breaking into homes. The footprints in the snow led to the home of Richard Browne. Lt. Ireland made a series of phone calls to determine if Browne was safe. He learned from one of Browne's relatives that someone had broken into Browne's home, held him at gunpoint, tied him up, held him in the basement, and ransacked his house. The attacker had also stolen Browne's pickup truck. Lt. Ireland reported this additional information over the radio and requested that all available units report to the scene.

In response, Sergeant Galen Estes arrived at the scene in his cruiser. Lt. Ireland then left to check on Browne, who confirmed that he had been attacked and gave a description of his attacker. Vassalboro Police Chief Mark Brown, followed later by Trooper Jeffrey Parks, joined Sgt. Estes at the Durango in separate vehicles.

When Trooper Parks, appellee here, arrived, he saw Chief Brown talking to someone in the Durango. He did not look at the person in the car but said he assumed it was the female suspect Lt. Ireland had described over the radio. Trooper Parks then left the scene to meet Lt. Ireland. At some point after Trooper Parks left, Sgt. Estes moved his cruiser away from the scene.

Lt. Ireland met Trooper Parks and told him to conduct safety checks of nearby residences. Lt. Ireland then returned to

- 4 -

the Durango to join Sgt. Estes and Chief Brown. After he arrived, he heard over the radio that another officer had located Browne's stolen truck. Immediately thereafter, he received a call from Kate Pineau. Pineau said that the armed suspect was in front of her house, which was about two tenths of a mile from the Durango. Lt. Ireland and Sgt. Estes left the scene to investigate. Lt. Ireland drove his police cruiser and Sgt. Estes took Chief Brown's vehicle. Chief Brown stayed with Amber and the Durango. No police vehicles remained at the scene.

Lt. Ireland and Sgt. Estes arrived at the Pineau residence. There, they found footprints. They followed the footprints and eventually saw the suspect. Lt. Ireland said that he realized that the suspect was heading back to the Durango. He told Sgt. Estes to warn Chief Brown over the radio, which he did. Lt. Ireland then headed back to the Durango.

After receiving Sgt. Estes's warning, Chief Brown saw the suspect running toward him. He said the suspect appeared to have a gun. Chief Brown identified himself as a police officer and ordered the suspect to drop his gun. He said the suspect ignored the order, ran to the passenger side of the Durango, and raised his right arm toward Chief Brown. Chief Brown said he believed his life was in danger and that the suspect was going to shoot at him. He fired at the suspect. He then took cover behind

a snowbank on the driver side of the Durango. Chief Brown heard the suspect fire at least one shot and returned fire.

The suspect got into the Durango and began driving. Amber was still in the passenger seat. Chief Brown said that he feared the suspect intended to fire on him again. He fired at least two additional shots at the driver-side door of the Durango, aiming for the driver. All parties agree that, had Amber been sitting upright in the passenger seat, she likely would have been hit by one of Chief Brown's bullets. The parties have stipulated that none of Chief Brown's shots hit Amber.

Meanwhile, Trooper Parks had heard over the radio that Lt. Ireland saw the suspect heading back to the Durango. He drove his police cruiser back to where the Durango had been. It had been approximately seventeen minutes since Trooper Parks had last been at the scene. Both police vehicles he had previously seen there were gone. As he approached, he said he heard multiple gunshots near the Durango. He said he saw someone crouched behind a snowbank and movement outside of the Durango. He concluded that the suspect and the police were exchanging fire. He parked his cruiser in the middle of the road, approximately twenty-five yards from the Durango. He got out and took cover behind his car.

Trooper Parks said he saw the Durango start driving toward him. The car was accelerating rapidly, and Trooper Parks said that from the engine noise he believed that the driver had

- 6 -

pushed the gas pedal to the floor. The road was too narrow for the Durango to pass Trooper Parks's cruiser without hitting a snowbank, so Trooper Parks concluded that the driver intended to ram his car. Trooper Parks quickly moved away from his cruiser and climbed on top of a snowbank. He said that it was a sunny day and that there was plenty of light outside. He said that, from the snowbank, he could see directly into the Durango and that nothing obstructed his view. He said that he saw only the driver and that the passenger seat appeared to be empty.

The Durango continued to accelerate toward Trooper Parks's car. Trooper Parks said he believed his life was in immediate danger. He fired several shots into the Durango as it passed within a couple feet of him and collided with his police cruiser. He said he aimed all of his shots at the driver and that he intended to stop the driver from using deadly force against him. The Durango crashed into Trooper Parks's cruiser, missing him by a few feet. The force of the impact pushed his cruiser about fifty feet down the road.

Lt. Ireland then arrived back at the scene. He said he had heard the gunshots but did not witness the crash. He saw that the Durango had crashed into Trooper Parks's cruiser. Lt. Ireland began to approach the Durango on foot. Once he was within fifteen or twenty yards of the Durango, he said that he could see the driver and that the driver appeared to have something in his hand.

The driver had his hand out of the driver-side window. Lt. Ireland identified himself as a state police officer and told the driver to show him both of his hands. Instead of complying, the driver put his arm back in the car, looked back over his shoulder at Lt. Ireland, then looked at his lap and the Durango's center console before looking back at Lt. Ireland. Lt. Ireland fired one shot, killing the driver.

The police then approached the Durango and found Amber slumped across the center console of the car with her head under the driver's arm. An autopsy revealed that a single bullet, stipulated to have been fired by Trooper Parks, had passed through her right shoulder and head, killing her. The parties agree that the trajectory of the bullet makes it extremely unlikely that Amber had been sitting upright in the Durango when she was shot.

## II. Procedural History

Fagre, as the personal representative of Amber's estate, filed suit against Trooper Parks, Lt. Ireland, and Chief Brown. Her complaint alleged: (1) use of excessive force against Amber in violation of the Fourth and Fourteenth Amendments under 42 U.S.C. § 1983; (2) use of excessive force against Amber in violation of Article 1, § 5 of the Maine Constitution under the Maine Civil Rights Act ("MCRA"), Me. Stat. tit. 5, § 4682; (3) failure to protect Amber in violation of the Fourteenth Amendment under 42

- 8 -

U.S.C. § 1983; (4) negligence under Maine state law; and (5) wrongful death under Maine state law.

The district court dismissed all of the claims against Chief Brown and Lt. Ireland, which Fagre does not appeal. After discovery, the district court granted Trooper Parks's motion for summary judgment. Fagre v. Parks, No. 19-CV-00083, 2020 WL 1066977, at *7 (D. Me. Mar. 5, 2020). As to Fagre's § 1983 claim,[1] the court held that Trooper Parks had not violated Amber's Fourth Amendment rights and was entitled to judgment as a matter of law. It added that, even if Trooper Parks had seized Amber in violation of the Fourth Amendment, he would be entitled to qualified immunity from § 1983 liability. The district court also granted summary judgment for Trooper Parks on the MCRA § 4682 claim because the protections of Article 1, § 5 of the Maine Constitution are coextensive with those of the Fourth Amendment. State v. Martin, 120 A.3d 113, 118 n.2 (Me. 2015). On the remaining claims, the court held that Trooper Parks's discretionary use of force was reasonable and that the Maine Tort Claims Act ("MTCA"), Me. Stat. tit. 14, § 8111(1), shielded him from tort liability.

Fagre appeals from the district court's grant of summary judgment.

---

[1] The district court did not address Fagre's other § 1983 claim that Trooper Parks failed to protect Amber because, after discovery, Fagre agreed not to pursue it.

**III. Analysis**

We review a grant of summary judgment de novo. See, e.g., Irish v. Fowler, 979 F.3d 65, 73 (1st Cir. 2020). We read the facts in the light most favorable to the non-moving party -- here, Fagre -- and make all reasonable inferences in her favor. Id.

A. Federal Claim

Fagre says that the district court erred in three ways when it granted Trooper Parks's motion for summary judgment on her § 1983 claim. First, she argues that the district court erred by holding that Trooper Parks did not seize Amber under the Fourth Amendment. Next, Fagre argues that the district court erred in concluding that Trooper Parks's use of force was objectively reasonable. Finally, she says that the court erred by concluding that Trooper Parks was entitled to qualified immunity. We hold that, on these facts, there was no Fourth Amendment violation because Trooper Parks's use of force was objectively reasonable. Further, the district court correctly concluded that Trooper Parks was entitled to qualified immunity.

Plaintiffs whose constitutional rights have been violated by someone acting under the color of state law can recover damages under 42 U.S.C. § 1983. See Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 621 (1st Cir. 2000). Fagre says that Trooper Parks used excessive force against Amber, which violated her Fourth

- 10 -

Amendment right to be free from an unreasonable seizure. See U.S. Const. amend. IV. To avoid summary judgment, she must allege facts showing that Trooper Parks (1) seized Amber and (2) did so unreasonably. See Brower v. County of Inyo, 489 U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"); see also Plumhoff v. Rickard, 572 U.S. 765, 774 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard.").

Setting aside whether Trooper Parks seized Amber,[2] Fagre "must show that the defendant officer employed force that was unreasonable under the circumstances." Kenney v. Floyd, 700 F.3d 604, 609 (1st Cir. 2012) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)). We assess reasonableness "from the perspective of a reasonable officer on the scene, rather than with

---

[2] In Landol-Rivera v. Cruz Cosme, 906 F.2d 791 (1st Cir. 1990), we held that a hostage was not "seized" within the meaning of the Fourth Amendment when a police officer shot the hostage while firing into a car containing both the hostage and a fleeing suspect. Id. at 795 ("A police officer's deliberate decision to shoot at a car containing a robber and a hostage for the purpose of stopping the robber's flight does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern."). Fagre argues that Brendlin v. California, 551 U.S. 249 (2007), requires us to revisit our holding in Landol-Rivera because Brendlin says that when a police officer intentionally stops a vehicle, the officer subjects all of the vehicle's occupants to a Fourth Amendment seizure. See id. at 255-57. Because we hold that Trooper Parks's actions were objectively reasonable, we do not need to reach this issue.

the 20/20 vision of hindsight" and account "for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)). The standard is objective and fact specific. See Graham, 490 U.S. at 397 ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

We first note that, based on the facts alleged and admitted by Fagre, no reasonable jury could conclude that Trooper Parks knew or should have known that Amber was in the car when he fired into the Durango. Trooper Parks had seen Chief Brown talking to Amber, who was in the Durango, when he first arrived at the scene. He then left to conduct safety checks on nearby residences. Seventeen minutes passed before Trooper Parks returned to the scene. In that time, he received no information indicating that Amber was still in the Durango. And when he returned to the scene, much had changed. Before, Trooper Parks had seen two police cars -- Sgt. Estes's cruiser and Chief Brown's vehicle -- near the Durango. Amber was with Sgt. Estes and Chief Brown. Now, he saw only the Durango and heard what appeared to be a shootout between the suspect and the police. He saw no police cars, did not see

- 12 -

Amber, and could have believed that Amber had been taken away in one of the police vehicles.

Trooper Parks's observations prior to him defending himself by shooting at the driver confirmed his belief that Amber was not in the Durango. After he climbed onto the snowbank, he looked directly through the windshield into the Durango as it sped toward him and saw only the driver. It is undisputed that he did not see Amber in the passenger seat and that the passenger seat appeared to be empty.[3] As other evidence showed, Trooper Parks did not and could not see Amber because she was slumped out of sight rather than sitting upright in the passenger seat. As the Durango sped toward Trooper Parks, Chief Brown had fired into it and likely would have hit Amber if she had been sitting upright. The path of Trooper Parks's bullet through Amber's body also indicated that she had not been sitting upright in the Durango. Indeed, when her body was found, her head was tucked under the driver's arm. Based on what Trooper Parks saw, he did not know and nothing in the record indicates he should have known that Amber had been in the Durango when he fired at the driver.

Fagre argues that Trooper Parks's use of force was unreasonable because Trooper Parks was not in imminent danger.

---

[3] Although below Fagre denied Amber was not in the front seat of the vehicle, she notably did not dispute Trooper Parks's statement that he could not see Amber in the passenger seat from his position on the snowbank.

- 13 -

She says that the driver, the Durango, and Amber posed no threat to anyone when Trooper Parks fired into the Durango.

"[T]he use of deadly force is constitutional only if, at a minimum, a suspect poses an immediate threat to police officers or civilians." Conlogue v. Hamilton, 906 F.3d 150, 156 (1st Cir. 2018) (quoting Jarrett v. Town of Yarmouth, 331 F.3d 140, 149 (1st Cir. 2003) (per curiam)).[4] No reasonable jury could conclude that it was unreasonable for Trooper Parks to believe that the driver posed an immediate threat. When Trooper Parks fired into the Durango, the suspect was attempting to ram Trooper Parks and his cruiser at full speed. See McGrath v. Tavares, 757 F.3d 20, 28 (1st Cir. 2014) ("The choices were to shoot or risk being run over. . . . A reasonable officer in this situation could reasonably believe he was facing a threat of serious physical harm, if not death."); see also Mitchell v. Miller, 790 F.3d 73, 80 (1st Cir. 2015) ("[T]he test is not whether a person was actually directly in the path of the car, but whether it was reasonable for [the officer] to believe -- at the point when events were rapidly unfolding -- that someone was at risk of serious physical harm."). That Trooper Parks climbed a snowbank did not remove the oncoming danger to him from the Durango or from his own cruiser once rammed

---

[4] If feasible, the suspect must also be warned before deadly force is used. Conlogue, 906 F.3d at 156. Fagre admits that a warning was infeasible.

- 14 -

by the Durango. The Durango passed within a few feet of Trooper Parks before hitting his police cruiser. It was travelling fast enough that, when it did hit his cruiser, the Durango pushed it fifty feet down the road. Had the driver changed course even slightly, he could have rammed into Trooper Parks instead of the police cruiser or rammed the police cruiser into the snowbank where Trooper Parks was. Fagre's argument that Trooper Parks was not in immediate danger because the Durango did not hit him and appeared to turn slightly away from him before hitting the cruiser is not persuasive. It relies on the "20/20 vision of hindsight," not the "perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396.

Trooper Parks also knew that the suspect had a gun. The driver, who had, moments earlier, fired his gun at another police officer and was now accelerating at full speed toward Trooper Parks, could have shot at Trooper Parks from the Durango. The Durango came close enough to Trooper Parks for the armed driver to pose an immediate threat. In the aftermath of the crash, the armed driver would also pose a risk to Trooper Parks or other officers at the scene. No reasonable jury could have concluded that Trooper Parks did not reasonably believe his life was in danger. There was no Fourth Amendment violation and summary judgment on Fagre's § 1983 claim was warranted.

- 15 -

Trooper Parks was also entitled to qualified immunity. "Government officials sued in their individual capacities are immune from damages claims unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time."'" Irish, 979 F.3d at 76 (quoting District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018)). The "clearly established" prong of qualified immunity involves two inquiries. It first "asks whether the precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" Id. (quoting Wesby, 138 S. Ct. at 590). Next, it asks "whether '[t]he rule's contours [were] so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (alterations in original) (quoting Wesby, 138 S. Ct. at 590).

Trooper Parks did not violate a federal statutory or constitutional right. Further, on these facts, we cannot say that every reasonable officer would have concluded that his life was not in danger. The Supreme Court has "stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." City of Escondido v. Emmons, 139 S. Ct. 500, 504 (2019) (quoting Wesby, 138 S. Ct. at 590). The case law does not clearly establish that it is unreasonable for an officer to conclude his life is in danger and

- 16 -

to use potentially deadly force under circumstances like these. Cf. Mitchell, 790 F.3d at 76, 79-80 (holding that it was not clearly established that an officer violated the Fourth Amendment when he fired into a car that could have run him over); McGrath, 757 F.3d at 28 (holding there was no Fourth Amendment violation when an officer fired into a car that could have run him over).

B. State Claims

Fagre also argues that the district court erred by granting summary judgment on her state law claims.

On Fagre's MCRA § 4682 claim, "Article I, section 5 of the Maine Constitution provides protections that are coextensive with the Fourth Amendment." Martin, 120 A.3d at 118 n.2; Clifford v. MaineGeneral Med. Ctr., 91 A.3d 567, 587 n.21 (Me. 2014). As we have described, there was no Fourth Amendment violation. Summary judgment on Fagre's § 4682 claim was proper.

On Fagre's negligence and wrongful death claims, Trooper Parks argues that he is entitled to immunity under the MTCA's discretionary function exception. See Me. Stat. tit. 14, § 8111(1)(C). This exception grants employees of governmental entities "absolute[] immun[ity] from personal civil liability" when they are "[p]erforming . . . any discretionary function or duty." Id. § 8111(1). A police officer's use of force is a discretionary act. See Roy v. Inhabitants of City of Lewiston, 42 F.3d 691, 696 (1st Cir. 1994) ("Maine case law has construed [the

- 17 -

MTCA] to apply to claims of excessive force." (citing Leach v. Betters, 599 A.2d 424, 426 (Me. 1991))). "Officers whose actions are '"objectively reasonable" in light of the facts and circumstances confronting them,' are not acting beyond the scope of their discretion and are immune under the [MTCA]." Richards v. Town of Eliot, 780 A.2d 281, 292 (Me. 2001) (citation omitted) (quoting Graham, 490 U.S. at 396). Because no reasonable jury could find that Trooper Parks's actions were not objectively reasonable, he is entitled to immunity under the MTCA.

**IV.**

Affirmed.